[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-14499

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUL 31, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 94-02680-CV-JAL

AMLONG & AMLONG, P.A.,
KAREN COOLMAN AMLONG,
et al.,

Interested Parties-Appellants,

versus

DENNY'S, INC.,
T.W. SERVICES, INC., et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 31, 2006)**

**(As Amended October 10, 2006)**
**(As Amended September 17, 2007)**

Before HULL, MARCUS and HILL, Circuit Judges.

MARCUS, Circuit Judge:

Karen Coolman Amlong, William R. Amlong, and their law firm, Amlong & Amlong, P.A., appeal from a district court order imposing sanctions in excess of $400,000, under 28 U.S.C. § 1927, for their conduct in representing a Title VII plaintiff in a sexual harassment lawsuit. After thorough review, we conclude that the district court committed reversible error when, after referring the issue of sanctions to a magistrate judge for an evidentiary hearing and Report and Recommendation, the district court discarded numerous findings of fact and credibility determinations made by the magistrate judge and substituted its own findings of fact on bad faith, without conducting any evidentiary hearing. The district court also abused its discretion in ordering the Amlongs to pay 10 percent back interest on a portion of the sanctions, and we, therefore, reverse that portion of the sanctions award too.

I.

The basic facts in the case are these: In May 1994, a former client introduced Miami attorney Debra Valladares to the plaintiff in this Title VII case, Floride Norelus, a Haitian immigrant. Norelus told Valladares that she had suffered a horrific pattern of sexual harassment, rape, and assault at the hands of Asif Jawaid, the manager of a Denny's restaurant where she worked. According to Norelus's second amended complaint, Jawaid repeatedly forced her to have oral, vaginal, and

2

anal sex with him in the Denny's restaurant and at his home. Norelus claimed that when she refused Jawaid's sexual demands, Jawaid assigned her unpleasant duties or otherwise punished her. She added that the manager, Jawaid, extracted sexual favors in exchange for job advantages, refused to file paperwork reflecting her alien status, and threatened to report her to the immigration authorities. Norelus also said Jawaid forced her to have sex with his roommate, Raheel Hameed, at their home and at another Denny's restaurant that Hameed managed. On one occasion, Norelus recounted, Jawaid and Hameed took her to their home, restrained her, repeatedly raped her, and penetrated her vagina with an object. Norelus stated that she informed Denny's authorities of the abuse, but they failed to take proper remedial steps. Jawaid allegedly retaliated by reducing Norelus's work hours and changing her work schedule.

Attorney Valladares met with Norelus, along with Valladares's former client, David Hill, and two of Norelus's brothers, for three hours. During this meeting, according to Valladares's testimony during the sanctions hearing conducted by the magistrate judge, one of Norelus's brothers told Valladares that Jawaid had personally confessed to having abused Norelus. Valladares said she also visited the two Denny's restaurants where Norelus claimed to have been abused. Valladares said a Denny's employee told her (in Valladares's words) that

3

Jawaid "definitely had a thing for [Norelus] and that she was like his property," and a Denny's patron told Valladares he had seen Jawaid mistreat Norelus. Neither individual, however, confirmed having witnessed sexual misconduct of the kind that Norelus alleged.

Valladares then sought assistance from another Miami attorney, Joseph Chambrot, and the two lawyers later sought out the Amlongs, who are well known South Florida Title VII lawyers. Working from a sample complaint the Amlongs provided from another case, Valladares and Chambrot filed Norelus's initial complaint in the United States District Court for the Southern District of Florida on December 19, 1994. The Amlongs' role was limited at that point, but in January 1995, they assumed formal representation of Norelus. The Amlong firm filed Norelus's first amended complaint in the district court on July 27, 1995, and then a second amended complaint on December 27, 1995. The Amlong firm assigned primary client contact responsibilities to a first-year associate, Lisa Stern (now Lisa Stern Taylor).

In the course of the pre-trial discovery process, Norelus was deposed over some eight days in January and February 1996. Taylor attended all the sessions, and Robin Hankins, another Amlong firm associate, attended some of them. Norelus had only limited facility with English, so an interpreter translated the

questions into Haitian French Creole and translated Norelus's answers back into English. The language difficulties were not the only obstacle in the deposition; Norelus's behavior was highly emotional and erratic. Sometimes she answered questions sarcastically or otherwise failed to respond properly. Until her lawyers instructed her to correct her testimony, Norelus lied about matters related to her immigration status. Among other things, she claimed that she did not know Lavictore Remy, the person whose name she had falsely used to secure employment. Taylor, the Amlong associate, told the defendants that this testimony was false, and she instructed Norelus to tell the truth. Norelus then admitted that in fact, Lavictore Remy was a relative. The plaintiff's first deposition produced a voluminous transcript of more than 1200 pages.

Amlong associates Taylor and Hankins also attended the February 1996 depositions of ten Denny's employees. Notably, none of these witnesses corroborated Norelus's story. Hankins reported back to Karen Amlong and expressed doubts about the case, but Amlong decided to press on with the case. In her testimony at the evidentiary hearing conducted by the magistrate judge, citing her extensive experience in Title VII cases, Amlong explained that the absence of corroborating witness testimony was not unusual in cases of sexual harassment and assault, because such abuse often occurs outside the presence of witnesses.

5

Moreover, Amlong said some of the witnesses' depositions contained inconsistencies of their own suggesting that the witnesses' testimony might not contain the whole story. Thus, for example, Amlong observed that Denny's manager Jawaid denied ever having had any physical relationship with Norelus, but some witnesses suggested Jawaid and Norelus might have had a consensual sexual relationship. Amlong said she hoped to exploit these inconsistencies at trial to cast doubt on the witnesses' veracity and draw out unrevealed facets of the story.

Nevertheless, Amlong testified, in order to test the veracity of the plaintiff's account of rape and sexual abuse, the firm retained the services of George Slattery, an experienced and respected polygraph examiner, to polygraph Norelus. The first of these examinations took place in January 1996, coinciding with Norelus's first deposition. Karen Amlong said that she wanted to conduct the examination earlier, but Norelus had become pregnant, and Slattery refused to administer a polygraph examination during her first trimester. The second polygraph examination took place on April 29, 1996. Slattery unambiguously concluded, after each examination, that Norelus was telling the truth about her core allegations of sexual abuse, rape, and assault. Norelus also received treatment from a Creole-speaking psychologist, Dr. Astrid Schutt-Aine, who advised the Amlongs that Norelus

6

appeared to suffer from post-traumatic stress disorder.

Karen Amlong testified that despite the problems with Norelus's testimony she remained convinced that Norelus was telling the truth. Amlong also observed that her ethical duties prevented her from withdrawing her representation. Amlong decided to press on with the suit. Accordingly, after Norelus's deposition, on Karen Amlong's instructions, Taylor reviewed the deposition testimony with Norelus and prepared an errata sheet. Taylor testified that she read the questions in English and another person translated. For reasons of cost, according to Taylor, they did not use a professional interpreter -- at one point Norelus's brother translated, and at another point a friend of Norelus's translated. Taylor recorded the reasons Norelus provided for each change.

The process produced an unusually long errata sheet -- some 63 pages detailing a total of 868 changes to Norelus's deposition testimony. Some of the changes were inconsequential or even harmed Norelus's case. For instance, at one point in the deposition the defense attorney had shown Norelus a time card that appeared to undermine her story. At that time, Norelus claimed she could not confirm the time card's authenticity because the card was not signed. When the defense attorney pressed the point, Norelus testified that she could not recall whether she usually signed her time cards. On the errata sheet, however, Norelus

changed her testimony so that she admitted unequivocally that she did not always sign her time cards. Other changes on the errata sheet, however, appeared to improve Norelus's case measurably by adding details that Norelus had not provided when she was deposed. Thus, for example, the testimony as reflected on the errata sheet provided details about Jawaid's and Hameed's cars and the route to their house, details that Norelus had previously said she could not recall.

After receiving the errata sheet, the defendants asked the district court to dismiss the case, arguing that the extent of the changes in the errata sheet demonstrated that Norelus had told numerous lies under oath. On August 26, 1996, the district court denied the motion, observing that, although the errata sheet raised doubts about the truth of Norelus's story, dismissal is only appropriate when "the plaintiff's lie is established beyond doubt." The trial court wrote: "In the instant action, it is unclear to the Court at this juncture whether Plaintiff's original or revised version of the facts constitutes the truth. Therefore, dismissal is an inappropriate remedy." The court did, however, grant the defendants' alternative request that it reopen Norelus's deposition and order Norelus to pay the costs of reopening the deposition. The district court also directed Norelus to file an appendix detailing any changes made to her testimony in her errata sheet or her second deposition.

Norelus's second deposition spanned three days in September 1996. Her behavior was again erratic and at times inappropriate. Finally, after one particularly insolent answer, the defendants' attorneys adjourned the deposition. On October 16, 1996, at the defendants' request, the district court entered another order specifying that the costs of reopening the deposition were jointly payable by Norelus and her attorneys. This order made no findings of fact or conclusions of law regarding the Amlongs' conduct. Then, on December 11, 1996, the district court dismissed the action as a sanction to punish Norelus for her failure to comply with the August 26, 1996, order. Specifically, the court noted, Norelus had not paid the costs of reopening the deposition and had not filed the requested appendix. The plaintiff took an appeal from the order of dismissal, but this Court dismissed the appeal for failure to prosecute on May 12, 1998.

After the dismissal of the suit, in January 1997, four of the defendants, Meos Corp., T.W. Services, Inc., Denny's, Inc., and Jawaid, sought sanctions against Norelus and the Amlongs. Pursuant to Title 28, § 636(b)(1) of the U.S. Code, the district court referred the sanctions motions to a magistrate judge to conduct an evidentiary hearing, make findings of fact and conclusions of law, and file a Report and Recommendation. On February 5, 1998, after conducting an extensive hearing, the magistrate judge issued a Report and Recommendation. The magistrate judge

recommended that the court assess attorney's fees against the plaintiff, Norelus, under 42 U.S.C. § 2000e-5(k), which permits recovery of attorney's fees from parties in civil rights actions. However, the magistrate judge squarely recommended that no sanctions, including attorney's fees, be imposed on Norelus's attorneys. The magistrate judge made factual findings that the Amlongs' conduct throughout the litigation, including their filing of the errata sheet, was motivated by a legitimate desire to present their client's case truthfully and accurately. He concluded that the Amlongs' conduct did not amount to bad faith conduct justifying sanctions under 28 U.S.C. § 1927.

Meos Corp., T.W. Services, Inc., Denny's, Inc., and Jawaid objected to the magistrate judge's Report and Recommendation and asked the district court judge to impose sanctions on the Amlongs notwithstanding the magistrate judge's many findings of fact. In a March 21, 2000, order, the district court judge sustained the objections based on her review of the hearing transcript, but notably, without having heard any testimony herself. The district court rejected the magistrate judge's factual findings and legal conclusions.

The district court concluded that sanctions against the Amlongs were warranted on the basis of four separate sources of judicial authority: 42 U.S.C. § 2000e-5(k); 28 U.S.C. § 1927; Rule 26(g) of the Federal Rules of Civil Procedure;

and the court's inherent powers. The district court found -- contrary to what the magistrate judge had found -- that the Amlongs had failed to adequately investigate the plaintiff's claims. The district court further found that the errata sheet the Amlongs filed after Norelus's first deposition was not designed to ensure that Norelus's testimony was accurate, as the magistrate judge had found, but rather was a dishonest effort to cover up weaknesses in the plaintiff's case.

The district court concluded that by the time the Amlongs filed the errata sheet, it had become clear that Norelus's suit was not grounded in fact, and continuing the lawsuit past that point amounted to bad faith. The district court ordered the Amlongs to pay the costs that Meos, T.W. Services, Inc., Denny's, Inc., and Jawaid had incurred in the litigation starting from the date the Amlongs filed the errata sheet. The district court expressly said that the amount payable would include the "fees, costs and expenses associated with the sanctions motions, evidentiary hearing and objections." In addition, because the Amlongs had not yet paid the costs of reopening the plaintiff's deposition as required by the district court's October 16, 1996, order, it again directed the Amlongs to pay that amount and added 10 percent back interest as an additional sanction.

Thereafter, a magistrate judge calculated attorney's fees according to the district judge's instructions. The district judge issued an order adopting the

magistrate judge's recommendations with modifications. The district court's order required the Amlongs to pay $18,599.76 to cover attorney's fees and costs incurred in reopening Norelus's deposition, as required by the court's October 16, 1996, order. The order further imposed an additional 10 percent interest on the $18,599.76 amount. Finally, and most significantly, the order required the Amlongs personally to pay a total of $389,739.07 to cover attorney's fees and costs the defendants had incurred after the filing of the errata sheet, as required by the court's March 21, 2000, order. This appeal followed.

II.

We review a district court's sanctions order for abuse of discretion. The same standard applies whether sanctions were imposed under any of the four provisions the district court invoked in this case. See, e.g., Schwartz v. Millon Air, Inc., 341 F.3d 1220, 1225 (11th Cir. 2003) (court reviews sanctions under 28 U.S.C. § 1927 for abuse of discretion); Malautea v. Suzuki Motor Co., 987 F.2d 1536, 1545 (11th Cir. 1993) (court reviews sanctions under Rule 26(g) for abuse of discretion); Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998) (court reviews sanctions under inherent powers for abuse of discretion); Sayers v. Stewart Sleep Ctr., Inc., 140 F.3d 1351, 1353 (11th Cir. 1998) (court reviews sanctions under 42 U.S.C. § 2000e-5(k) for abuse of discretion).

12

"The application of an abuse-of-discretion review recognizes the range of possible conclusions the trial judge may reach." United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc). "[W]hen employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." Id. (citing Maiz v. Virani, 253 F.3d 641, 662 (11th Cir. 2001)). A decision that is contrary to the law plainly is an abuse of discretion. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law . . . .").

## A.

First, we address the largest component of the sanctions levied against the plaintiff's Title VII attorneys: the district court's March 21, 2000, order requiring the Amlongs to pay $389,739.07 to cover the attorney's fees and costs that Meos Corp., T.W. Services, Inc., Denny's, Inc., and Jawaid incurred in defending the suit after June 20, 1996, the date the Amlongs filed the errata sheet.

We begin with the legal standard that governs the imposition of sanctions in this case. The district court grounded its sanctions order on four broad sources of authority: 42 U.S.C. § 2000e-5(k); 28 U.S.C. § 1927; Rule 26(g) of the Federal Rules of Civil Procedure; and the court's inherent powers. When a district court

13

cites multiple sources of authority for issuing sanctions, the appellate court's basic task in reviewing the sanctions is to determine whether the sanctions were permissible under at least one of those sources of authority. See Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1365 (11th Cir. 1997). If any one of the sources of authority invoked by the district court provides a sound basis for the sanctions, we must affirm the sanctions order. But if sanctions are not valid under any of the sources of authority, the appellate court must reverse the sanctions award.

Appellants contend, and appellees do not dispute, that § 2000e-5(k) and Rule 26(g) clearly could not have supported the district court's award of sanctions. The appellants are correct. The Title VII attorney's fees provision, 42 U.S.C. § 2000e-5(k), could not have supported these sanctions, because the provision authorizes attorney's fees only against litigants, not against counsel. Roadway Express, Inc. v. Piper, 447 U.S. 752, 761 (1980) (noting that § 2000e-5(k) "makes [no] mention of attorney liability for costs and fees" and there is no indication that Congress intended the provision "to control the conduct of litigation"); Durrett v. Jenkins Brickyard, Inc., 678 F.2d 911, 915 (11th Cir. 1982) ("[Section 2000e-5(k)] contemplates assessments of attorney's fees against losing parties, not against counsel." (citing id.)).

Rule 26(g) of the Federal Rules of Civil Procedure also could not have supported the sanctions award, because that rule only authorizes sanctions traceable to specific discovery abuses. See Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1373 n.45 (11th Cir. 1997) (noting that Rule 26(g) did not authorize an order requiring a defendant to pay all the costs incurred in the discovery dispute because the defendant's discovery abuses were only partly to blame for the delay in the litigation). In this case, the district court issued sanctions for the Amlongs' decision to proceed vexatiously and in bad faith with a meritless suit, not for any specific discovery violation.

That leaves two sources of authority to consider: 28 U.S.C. § 1927, and the court's inherent powers. We have observed that a district court's authority to issue sanctions for attorney misconduct under § 1927 is either broader than or equally as broad as the district court's authority to issue a sanctions order under its inherent powers. See Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1178 n.6 (11th Cir. 2005). Therefore, we only examine whether the sanctions imposed here were a proper exercise of the discretion granted to the court under § 1927. If the sanctions were permissible under § 1927, then they were proper, and there is no need to examine whether the sanctions were also permissible under the court's inherent powers. On the other hand, if the sanctions amounted to an abuse of the district court's

discretion under § 1927, they necessarily amounted to an abuse of the court's

discretion under its inherent powers, because the court's inherent power to issue

sanctions for vexatious conduct by attorneys does not reach further than § 1927.

Title 28, § 1927 states:

§ 1927. Counsel's liability for excessive costs

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. As a panel of this Court observed in Peterson v. BMI

Refractories, 124 F.3d 1386 (11th Cir. 1997), the plain language of the statute

imposes three essential requirements for an award of sanctions under § 1927:

First, the attorney must engage in "unreasonable and vexatious" conduct. Second, that "unreasonable and vexatious" conduct must be conduct that "multiplies the proceedings." Finally, the dollar amount of the sanction must bear a financial nexus to the excess proceedings, i.e., the sanction may not exceed the "costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

Id. at 1396.

We have consistently held that an attorney multiplies proceedings

"unreasonably and vexatiously" within the meaning of the statute only when the

attorney's conduct is so egregious that it is "tantamount to bad faith." Avirgan v.

Hull, 932 F.2d 1572, 1582 (11th Cir. 1991); see also Schwartz v. Millon Air, Inc.,

16

341 F.3d 1220, 1225 (11th Cir. 2003) ("'Bad faith' is the touchstone.").

The Amlongs argue, however, that "bad faith" in this context means subjective bad faith -- that is, deliberate wrongdoing, such as proceeding with claims the attorney knows for a fact are false or frivolous. In other legal contexts, the term "bad faith" usually refers to deliberate fraud or misconduct. See Black's Law Dictionary 149 (8th ed. 2004) (defining "bad faith" as "[d]ishonesty of belief or purpose"); cf. United States v. Foxman, 87 F.3d 1220, 1223 n.2 (11th Cir. 1996) (interpreting references to "bad faith" delay in criminal prosecutions to mean situations where "the government acted to delay an indictment, hoping that the delay . . . would prejudice the defense"). But it is clear from the statutory language and the case law that for purposes of § 1927, bad faith turns not on the attorney's subjective intent, but on the attorney's objective conduct. The term "unreasonably" necessarily connotes that the district court must compare the attorney's conduct against the conduct of a "reasonable" attorney and make a judgment about whether the conduct was acceptable according to some objective standard. The term "vexatiously" similarly requires an evaluation of the attorney's objective conduct. See Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421 (1978) (noting, in the course of interpreting 42 U.S.C. § 2000e-5(k), that "the term 'vexatious' in no way implies that the plaintiff's subjective bad faith is a necessary prerequisite to a

17

fee award against him"), Black's Law Dictionary 1596 (8th ed. 2004) (defining

"vexatious" as "without reasonable or probable cause or excuse; harassing;

annoying").

Indeed, other circuits, too, have found that the phrase "unreasonably and

vexatiously" demands an objective analysis and that § 1927 does not require a

malicious intent or a bad purpose. For example, in Cruz v. Savage, 896 F.2d 626

(1st Cir. 1990), the First Circuit stated, "The attorney need not intend to harass or

annoy by his conduct nor be guilty of conscious impropriety to be sanctioned. It is

enough that an attorney acts in disregard of whether his conduct constitutes

harassment or vexation . . . ." Id. at 632. Similarly, in Knorr Brake Corp. v. Harbil,

Inc., 738 F.2d 223 (7th Cir. 1984), the Seventh Circuit noted that a court "need not

find that the attorney acted because of malice" to issue sanctions against the

attorney. Id. at 227 (footnote omitted). The Tenth Circuit in Braley v. Campbell,

832 F.2d 1504 (10th Cir. 1987), explicitly said that the statute demands an

objective analysis. Id. at 1512 (holding that "the proper standard under . . . § 1927

is that excess costs, expenses, or attorney's fees are imposable against an attorney

personally for conduct that, viewed objectively, manifests either intentional or

reckless disregard of the attorney's duties to the court."). The Sixth Circuit in Jones

v. Continental Corp., 789 F.2d 1225 (6th Cir. 1986), observed that "28 U.S.C. §

18

1927 authorizes a court to assess fees against an attorney for 'unreasonable and vexatious' multiplication of litigation despite the absence of any conscious impropriety." Id. at 1230. But see, e.g., Oliveri v. Thompson, 803 F.2d 1265, 1273 (2d Cir. 1986) (holding that sanctions are appropriate under § 1927 only if "the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose").

Other courts also have determined that "reckless" conduct is sufficient to justify sanctions under § 1927. See, e.g., Estate of Blas ex rel. Chargualaf v. Winkler, 792 F.2d 858, 860 (9th Cir. 1989) (stating that sanctions under § 1927 require a finding of bad faith, but a showing of either "recklessness or bad faith" is adequate to support such a finding); Manax v. McNamara, 842 F.2d 808, 814 (5th Cir. 1988) (holding that "recklessness, bad faith, or improper motive" can support a finding of unreasonable and vexatious conduct). These observations also prescribe an objective analysis, because reckless conduct simply means conduct that grossly deviates from reasonable conduct. See Schwartz, 341 F.3d at 1227 (describing recklessness as "a gross deviation from conduct that might be reasonable in the circumstances"); W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 34 (5th ed. 1984) (stating that although the term "recklessness" seems to suggest a certain state of mind, recklessness usually "can be proved only

19

by the conduct and the circumstances," and "an objective standard must of necessity in practice be applied"); Black's Law Dictionary 1298–99 (8th ed. 2004) ("Reckless conduct is . . . a gross deviation from what a reasonable person would do."). Determining whether conduct is reckless necessarily involves comparing the conduct objectively against the conduct of a reasonable attorney.

The terminology and explanation that we have employed in the past is wholly consistent with the idea that sanctions under § 1927 are measured against objective standards of conduct. In Schwartz v. Millon Air, Inc., we stated that sanctions are permissible "where an attorney knowingly or recklessly pursues a frivolous claim." 341 F.3d at 1225 (emphasis added). Thus, objectively reckless conduct is enough to warrant sanctions even if the attorney does not act knowingly and malevolently. In Malautea v. Suzuki Motor Co., 987 F.2d 1536 (11th Cir. 1993), we found that an attorney's conduct was "tantamount to bad faith" when he "either carelessly or deliberately" covered up evidence. Id. at 1544.

In short, a district court may impose sanctions for egregious conduct by an attorney even if the attorney acted without the specific purpose or intent to multiply the proceedings. That is not to say the attorney's purpose or intent is irrelevant. Although the attorney's objective conduct is the focus of the analysis, the attorney's subjective state of mind is frequently an important piece of the

20

calculus, because a given act is more likely to fall outside the bounds of acceptable

conduct and therefore be "unreasonabl[e] and vexatious[]" if it is done with a

malicious purpose or intent.[1]

---

[1] Judge Hill's dissent suggests that subjective intent is irrelevant to a determination of objective bad faith, although he appears to agree that subjective bad faith, if proved, can support a finding of objective bad faith. We agree that subjective bad faith is not necessary to a finding of objective bad faith, and that the absence of subjective bad faith does not excuse objectively blameworthy conduct. But a determination of whether an attorney's conduct was objectively reckless, or tantamount to bad faith, may be aided by an examination of the attorney's state of mind. Thus, in this case the lawyer's purpose in filing the errata sheet was explored at considerable length both by the magistrate judge, after taking testimony, and by the district judge, who took no testimony herself. Indeed, the district court in this case felt obliged to justify its determination of objective bad faith by finding as a fact not just reckless conduct, but also that the Amlongs submitted the errata sheet "in an effort to bolster testimony," "repair the damage," and "cover[] up falsities." As we note later, see infra note 5, a finding of a cover-up or concealment is fact-specific and was essential to the ultimate legal determination. In Schwartz v. Millon Air, Inc., for example, we reversed sanctions against attorneys who had litigated false claims based on the representations of an Ecuadorean attorney. We noted that "[n]o one contends that [the appellant attorneys] were actually aware of the fraud," thus suggesting that the very same series of litigation maneuvers, if accompanied by a bad purpose, might have been inexcusable and sanctionable. Schwartz, 341 F.3d at 1226; see also Miles v. Dickson, 387 F.2d 716, 717 (5th Cir. 1967) (per curiam) (reversing a district court's imposition of attorney's fees based on a conclusion that "the plaintiffs' attorneys acted in good faith, upon written authorization from their clients" and "the facts and circumstances do not present such an extreme case as would permit the court to tax the costs against the attorneys"); cf. Dreiling v. Peugeot Motors of Am., Inc., 768 F.2d 1159, 1166 (10th Cir. 1985) (taking note of a threatening letter an attorney sent to the defendant in the course of determining whether pressing claims against the defendant was unreasonable and vexatious); McCandless v. Great Atl. & Pac. Tea Co., 697 F.2d 198, 201 (7th Cir. 1983) (stating that relevant factors in finding bad faith include "reasons for filing the suit and whether the attorney was aware of the meritlessness of the action"). An attorney's knowledge and intent at each step in the drama may be relevant to the ultimate legal determination that the conduct is objectively reckless, or that bad faith is evident.

The dissent, citing Souran v. Travelers Insurance Co., 982 F.2d 1497 (11th Cir. 1993), also argues that our case law categorically bars any consideration of an attorney's knowledge, motive, or state of mind in evaluating her objective conduct. We disagree. Souran involved Rule 11 sanctions. Id. at 1506–07. While many of the same general principles apply to sanctions under Rule 11 and sanctions under § 1927, Rule 11 and § 1927 are distinct sources of authority. They are aimed at addressing different kinds of misconduct, are different in scope, and are governed by quite different legal standards. See, e.g., Byrne v. Nezhat, 261 F.3d 1075, 1106 (11th Cir. 2001) (noting that Rule 11 "is aimed primarily at pleadings" and addresses the

21

It is also, by now, clear that negligent conduct, standing alone, will not support a finding of bad faith under § 1927 -- that is, an attorney's conduct will not warrant sanctions if it simply fails to meet the standard of conduct expected from a reasonable attorney. Thus, in Schwartz, we wrote:

> [Section 1927] is not a "catch-all" provision for sanctioning objectionable conduct by counsel. . . . For sanctions under section 1927 to be appropriate, something more than a lack of merit is required. The statute was designed to sanction attorneys who "willfully abuse the judicial process by conduct tantamount to bad faith."

> "Bad faith" is the touchstone. Section 1927 is not about mere negligence. A determination of bad faith is warranted where an attorney knowingly or recklessly pursues a frivolous claim or engages in litigation tactics that needlessly obstruct the litigation of non-frivolous claims.

Schwartz, 341 F.3d at 1225.

Thus, an attorney's conduct must be particularly egregious to warrant the imposition of sanctions -- the attorney must knowingly or recklessly pursue a frivolous claim or needlessly obstruct the litigation of a non-frivolous claim. If the attorney's misconduct meets this high standard, the district court may order the

---

conduct of both parties and attorneys, while § 1927 addresses "dilatory tactics throughout the entire litigation" and is focused solely on attorney conduct); Chambers v. NASCO, Inc., 501 U.S. 32, 47 (1991) (noting that Rule 11 permits attorney's fees "for conduct which merely fails to meet a reasonableness standard," in contrast to a court's inherent powers, which require a higher showing). Rule 11 cases do not dispose of the issues arising under § 1927. Moreover, the quoted portion of Souran -- a brief parenthetical quoting language from a Vanderbilt Law Review student note -- plainly was not essential to the Court's holding; it was dicta. In fact, the Court in Souran reversed the district court's imposition of Rule 11 sanctions based on a finding that the attorney's conduct was objectively reasonable.

22

attorney to pay the "costs, expenses, and attorneys' fees reasonably incurred" because of the attorney's misconduct -- that is, the excess costs that the attorney's multiplication of proceedings has added to the cost of the litigation. See 28 U.S.C. § 1927; Peterson v. BMI Refractories, 124 F.3d 1386, 1396 (11th Cir. 1997) (explaining that sanctions under § 1927 "must bear a financial nexus to the excess proceedings").

B.

With this background, we turn to the district court's decision to impose sanctions and the procedures it employed in making its determination.

Plainly, an attorney threatened with sanctions under § 1927 is entitled to a hearing. Reynolds v. Roberts, 207 F.3d 1288, 1302 (11th Cir. 2000). In this case, the district court designated a magistrate judge to conduct the necessary evidentiary hearing pursuant to 28 U.S.C. § 636(b)(1), which permits a district court to refer matters to a magistrate judge to hold hearings and supply the court with proposed findings of fact and recommendations for disposition.[2] Pursuant to

---

[2](b)  (1)  Notwithstanding any provision of law to the contrary–

   (A)  a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to

23

this order of reference, the magistrate judge conducted an evidentiary hearing over four days involving the testimony of six witnesses, including four of the plaintiff's attorneys, who each testified at length about their conduct of the suit, and George Slattery, the polygrapher who twice examined the plaintiff. When reduced to transcript form, the evidentiary hearing consumed some 505 pages.

After hearing the evidence and receiving filings from the parties, as we have noted, the magistrate judge submitted a detailed Report and Recommendation

> involuntarily dismiss an action. A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law.
>
> (B)    a judge may also designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A), of applications for posttrial relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.
>
> (C)    the magistrate judge shall file his proposed findings and recommendations under subparagraph (B) with the court and a copy shall forthwith be mailed to all parties.
>
> Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (footnote omitted).

24

including extensive findings of fact and conclusions of law. Based on the testimony at the evidentiary hearing, the magistrate judge made several findings of fact regarding the Amlongs' conduct. First, the magistrate judge unambiguously found as a fact that throughout the litigation, the Amlongs had "genuinely believed that plaintiff's claims were meritorious despite plaintiff's inability to testify completely and truthfully about several aspects of her case." Second, the magistrate judge found that Karen Amlong, an experienced Title VII attorney, "personally met with plaintiff on more than one occasion and satisfied herself that plaintiff was telling the truth" (emphasis added). He accepted Amlong's explanation that she "was not surprised or particularly concerned that the sexual harassment activities alleged in this case were not observed by others [because] 'they seldom are in this type of case.'" Third, the magistrate judge found as a fact that "[p]laintiff's counsel also did not ignore plaintiff's propensity to exaggerate or lie during her deposition," noting that the plaintiffs ordered two polygraph examinations by George Slattery, a certified polygraph examiner, in order to further test the plaintiff's veracity.

The magistrate judge then made a number of explicit findings of fact relating to the errata sheet, which, the defendants claimed, made the attorneys' bad faith readily apparent. He wrote:

First, the preparation of the errata sheet and the procedures used to do so . . . was improper and should not have occurred. Second, the numerous changes listed in the errata sheet . . . illuminated plaintiff's difficulty or inability to relate a consistent account of events underlying her claims. Third, the errata sheet revealed to defendant's attorneys and the Court that plaintiff's testimony was highly suspicious and required further exploration through reopened discovery.

However, the preparation of the errata sheet revealed other things. <u>First and foremost, the care and detail in which that document was prepared by plaintiff's attorneys reveal their grave concern to tell an accurate story in this case.</u> While many of the changes might have bolstered plaintiff's case, submission of this voluminous document clearly did not, and left plaintiff open to renewed challenges concerning her credibility. Also, the errata sheet demonstrates, at least in part, the difficulty plaintiff had in dealing with the discovery process including her deposition.

(emphasis added).

The magistrate judge also determined that the Amlongs should not be faulted for the plaintiff's conduct, because they "did the best they could with a most difficult client and did not try to prolong the case or multiply these proceeding[s] to gain a tactical advantage over their adversaries. Prolonging this case, by extending plaintiff's deposition and exposing plaintiff to further cross-examination, only hindered counsel's ability to win the case."

Overall, the magistrate judge concluded that the Amlongs acted for good and honest reasons, and that their conduct did not amount to bad faith under an objective test. He found expressly that the Amlongs' conduct did not demonstrate either subjective bad faith or objective bad faith. He stated, "the undersigned finds

26

no evidence of bad faith, improper motive or reckless disregard of duty which would justify § 1927 sanctions against plaintiff's attorneys in this case. Nor does the undersigned find[] that plaintiff's counsel sought to or willfully abused the judicial process by conduct tantamount to bad faith" (citations omitted).

The district court flatly rejected the magistrate judge's findings, saying they were contrary to the record. The district judge then went on to make factual findings of her own, notably without any additional hearing, but based on her own independent interpretation of the transcript and record. The district court found that the errata sheet would have put any reasonable attorney on notice that the plaintiff's testimony "may be incred[ible]," and from the time they filed the errata sheet, "counsel for Plaintiff were on notice of the baseless nature of the claims . . . and had an obligation to investigate their client's testimony and the supporting evidence." The district court found that Karen Amlong and William Amlong were chiefly responsible for the conduct of the case. The district court further found that the Amlongs failed to "conduct a reasonable investigation of the facts" alleged in the plaintiff's complaint and her subsequent amended complaints. The district court judge called attention to the fact that the Amlongs had not interviewed fact witnesses other than the plaintiff and had not ordered transcripts from the

27

depositions of the other witnesses.[3] Finally, and most significantly for our

purposes, the district court found that the Amlongs filed the errata sheet with the

court not for the legitimate purpose of correcting misstatements and inaccuracies,

as the magistrate judge had found, but in an effort to cover up flaws and

inconsistencies in the plaintiff's account of events. The district court determined

that the errata sheet demonstrated "unreasonable, vexatious behavior that

unnecessarily multiplied these proceedings."

The district court's rejection of the magistrate judge's findings in this

manner violated the governing statute, 28 U.S.C. § 636(b)(1), as it has been

interpreted by our case law. When a district court refers a matter to a magistrate

judge to conduct an evidentiary hearing and make findings of fact, the district court

is required to make a "de novo determination." Id. In making its determination, the

district court is generally free to employ the magistrate judge's findings to the

extent that it sees fit -- the court may adopt the magistrate judge's findings in

whole, in part, or not at all. Thus, in United States v. Raddatz, 447 U.S. 681

(1979), the Supreme Court made clear that § 636(b)(1) permits the district court to

adopt the credibility findings made by a magistrate judge without conducting a

---

[3]In her testimony at the evidentiary hearing, Amlong explained that the firm usually has its associates take extensive notes at witnesses' depositions so that the firm does not have to order -- and pay for -- transcripts from all of the witnesses' depositions prior to trial.

new hearing before making a final determination. However, in a footnote, the

Supreme Court remarked that there may be one exception to this rule. The statute

may not permit a district court to <u>reject</u> a magistrate judge's findings regarding the

credibility of testifying witnesses without holding a new hearing where it could

observe the demeanor of the witnesses:

> [W]e assume it is unlikely that a district judge would <u>reject</u> a magistrate's proposed findings on credibility when those findings are dispositive and substitute the judge's own appraisal; to do so without seeing and hearing the witness or witnesses whose credibility is in question could well give rise to serious questions which we do not reach.

<u>Id.</u> at 681 n.7.

Our cases since <u>Raddatz</u> have unambiguously and repeatedly observed that a

district court may not reject a magistrate judge's factual and credibility findings in

this manner. In <u>United States v. Marshall</u>, 609 F.2d 152 (5th Cir. 1980), the former

Fifth Circuit[4] stated, "[I]t would be a rare case in which a district judge could

resolve credibility choices contrary to the recommendations of the magistrate

without himself having had an opportunity to see and hear the witnesses testify."

<u>Id.</u> at 155. Again, in <u>Louis v. Blackburn</u>, 630 F.2d 1105 (5th Cir. 1980), a panel of

the former Fifth Circuit held that when a criminal defendant's constitutional rights

---

[4]In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir.1981) (en banc), this Court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. <u>Id.</u> at 1209.

are at stake, "the district judge should not enter an order inconsistent with the credibility choices made by the magistrate <u>without personally hearing the live testimony of the witnesses whose testimony is determinative</u>." <u>Id.</u> at 1109 (emphasis added). The former Fifth Circuit extended this principle to civil cases in <u>Calderon v. Waco Lighthouse for the Blind</u>, 630 F.2d 352, 356 (5th Cir. 1980). In <u>Calderon</u>, a panel of the Court said that in some cases a district court might be able to reject a magistrate judge's findings based on a transcript alone, but, notably, if the witnesses' demeanor was important to the magistrate judge's determination, the district court would have to hold a new evidentiary hearing and take testimony before rejecting the magistrate judge's findings. <u>Id.</u> Most recently, in <u>United States v. Cofield</u>, 272 F.3d 1303 (11th Cir. 2001) (per curiam), relying in part on <u>Marshall</u> and <u>Blackburn</u>, we reaffirmed the principle that "generally a district court must rehear the disputed testimony before rejecting a magistrate judge's credibility determinations." <u>Cofield</u>, 272 F.3d at 1306.

The district court's order in this case flatly violated the rule. The magistrate judge made clear that his findings turned on his evaluation of the credibility and believability of the testimony given at the evidentiary hearing; indeed, he stated that his findings were based on "hearing the testimony from plaintiff's counsel concerning their representation of plaintiff in this case." The magistrate judge's

30

evaluation required him to make finely tuned assessments of various witnesses' credibility as they testified about their states of mind, beliefs, motivations, and actions at each critical stage of the litigation. It is clear that the witnesses' demeanor and credibility at the evidentiary hearing played a critical role in the magistrate judge's findings about the Amlongs' purpose and intent and his conclusion regarding their objective conduct. The demeanor of the witnesses at the evidentiary hearing plainly influenced the magistrate judge's determinations about whether the Amlongs and the plaintiff's other attorneys arranged the polygraph examinations as a stratagem for creating a facade of diligence or, rather, as a genuine effort to discern whether the plaintiff was telling the truth.

The Amlongs retained George Slattery, the polygraph examiner, who testified that he had performed evaluations in a wide range of cases for an impressive range of law firms, judges, prosecutor's offices, defense attorneys and public defender agencies at both the state and federal levels, as well as state and federal law enforcement agencies. Slattery insisted that when he performs services for attorneys involved in civil litigation, his results are not swayed by what the attorneys hope to see. He added that he had evaluated other Amlong clients in the past and had reported his conclusions to the Amlongs even when he suspected falsehoods.

Three of the plaintiff's attorneys, Debra Valladares, Joseph Chambrot, and Karen Amlong, also testified at length about the polygraph examination. Chambrot, for example, testified that the reason the plaintiff's lawyers agreed to have Norelus polygraphed was "[t]o avoid being here [in sanctions proceedings]. To know that we have, you know, a valid cause of action. To avoid misrepresenting to the court or having, you know, the bulk of the case just being a lie." Chambrot said he trusted in Slattery's determination because Slattery was "somebody who I believe, you know, is really credible and who's truly independent. Mr. Slattery doesn't care one way or the other the outcome of this case." Plainly, the magistrate judge credited this too in finding no bad faith.

Witness testimony from the plaintiff's lawyers also was crucial to the magistrate judge's evaluation of several other key aspects of the case. Lisa Stern Taylor, the Amlong associate who had the most direct contact with the plaintiff, testified about the instructions she received from the Amlongs and the procedures she followed in preparing the errata sheet that the district court later found to be the most salient and concrete indicium of the Amlongs' bad faith. Taylor's demeanor in testifying influenced the magistrate judge's acceptance of Taylor's explanation of her actions. Thus, Taylor testified expressly that the errata sheet was intended to present the facts accurately, and not to put a false or misleading sheen on the

32

plaintiff's story:

> Q [William Amlong]    Okay. What instructions, if any, had you been given by Ms. Amlong and/or me concerning the preparation of the errata sheet?
>
> A    Just by Ms. Amlong to please go to the court reporter's office with Ms. Norrelus [sic] and have her go through the deposition and to prepare an errata sheet and to make sure that every time there was a change that I listed a reason for it because that's what the Rules required, I believe.
>
> Q    When you changed the testimony, at whose suggestion did you change the testimony?
>
> A    Any testimony that I changed was made because my client told me that whatever she was telling me was the accurate response.

Taylor emphatically stated that she had not suggested any changes Norelus should make in her testimony, and had not seen any indication that Norelus's brother or friend had suggested any such changes.

Karen Amlong's testimony also strongly influenced the magistrate judge's findings. Amlong described the firm's handling of the lawsuit in detail from start to finish. Amlong stressed that her assessment of Norelus's veracity was consistent with the conclusions reached by four other attorneys, William Amlong, Valladares, Chambrot, and Taylor; the polygrapher, Slattery; and Dr. Astrid Schutt-Aine, the psychologist who examined Norelus and diagnosed her with post-traumatic stress disorder. Amlong said her assessment of the plaintiff also relied in no small part on her own interactions with Norelus, and her many years of experience litigating

33

cases of serious sexual harassment.

Karen Amlong explained how the firm handled Norelus's false statements about the plaintiff's fraudulent use of her relative's name and identification this way:

> [Karen Amlong]     We were concerned, however, because there were some issues of Ms. Norrelus using the Social Security number of her aunt, there were some inconsistencies that had come out in the testimony during these depositions and Ms. Stern had called us when she realized that Ms. Norrelus had lied, and I believe it was about using her aunt's Social Security number or her name, the alias.
>
> She [Taylor] had called us from the depositions and we said, "<u>You have got to go in there and set the record straight</u>."
>
> After our conversation with Ms. Hankins about these other depositions --
>
> Q [William Amlong]     When you told Ms. Stern to go in and set the record straight, is that your understanding of the Florida Bar Rules of Professional Responsibility and what they require as candor toward the tribunal?
>
> A     Yes, it is, and when Ms. Stern realized that she had stated a mistruth she had no option except to go back in and set the record straight.
>
> We were concerned, nonetheless, about what may have been a cultural difference; is it okay to just use somebody else's name or Social Security number?
>
> So we called Ira Kurzban, who has had--he's an attorney in town who has worked extensively with Haitian clients . . . .
>
> Based on our conversation with Mr. Kurzban, we were convinced that our client, based on all the evidence-my own assessment of her, her passing

34

the polygraph examination, Ms. Stern's assessment of her after several days of deposition testimony--that even though she may have lacked candor on peripheral issues, on the central issues of this case she was telling the truth, and just because somebody came into the country illegally doesn't mean that she can be raped and exploited, and that does not take that away from her.

(emphasis added).

The language and cultural difficulties Amlong alluded to in this exchange also were a recurring problem throughout the litigation, according to the attorneys' testimony. The plaintiff's lawyers testified that Norelus spoke only fragmentary English, although her English improved during the course of the litigation. Taylor testified that on several occasions during the deposition, Norelus told the interpreter her translations were incorrect, until at one point the interpreter responded with a brusque remark. Once, the plaintiff apparently used a Creole idiom, "tous les jours," to communicate that Jawaid forced her to perform oral sex "many times" or "all the time," but the interpreter translated the idiom literally as "every day," thus changing the details of the plaintiff's story. Even the defendants adverted to language difficulties -- in an apparent effort to discount the import of the polygraph examinations, they elicited testimony from a translator who suggested that Slattery, the polygraph examiner, had used flawed Creole translations. Amlong testified that throughout the litigation, Norelus proved a "difficult client because of language barriers and because of the degree to which

35

she had been traumatized," but Norelus's behavior in the reopened deposition improved as Norelus's English improved, she became more comfortable with the process, and the defense attorneys became less aggressive. The magistrate judge was plainly troubled by the reported language and cultural difficulties. Indeed, he found that the errata sheet showed "the difficulty plaintiff had in dealing with the discovery process including her deposition."

As for the production of the errata sheet, Amlong specifically said, "[T]he idea [was] not to hide things from people, but to make full disclosure, and we weren't trying to hide anything from defense counsel, we were trying to tell them what the story was so that they could prepare themselves." She said, "This was our way of attempting to set the record straight." From a tactical perspective, Amlong added, it would have been easier to proceed to trial without filing the errata sheet, but "I felt that [filing the errata sheet] was the appropriate thing to do. . . . [W]e were trying to do the best job we could to present as honestly as we could what the truth was."

In short, the magistrate judge was called on to find basic facts and draw delicate inferences about the judgments the Amlongs made, and the actions they took based on those judgments, at various stages of the litigation. His evaluation was undeniably influenced by the extensive testimony taken at the evidentiary

36

hearing over four days in 1997. Indeed, the raw transcript of the hearing could not have captured the nuances of the testimony or the demeanor of the witnesses in a way that would have fairly allowed the district court to make a reliable determination that the magistrate judge was wrong in finding facts and choosing to believe the witnesses.

More particularly, the magistrate judge chose to believe Slattery's and the attorneys' representations that the polygraph examinations were a genuine effort to discern the truth, not a fraudulent attempt to create a false veneer of diligence. The magistrate judge chose to credit the attorneys' statements that they had believed the plaintiff's core allegations throughout the litigation. He interpreted the filing of the errata sheet as having been motivated by the plaintiff's lawyers' "grave concern to tell an accurate story," just as Amlong and Taylor had stated in their testimony. The attorneys testifying at the evidentiary hearing attributed some of the apparent irregularities in the litigation to the plaintiff's emotional instability and substantial language and cultural barriers. The magistrate judge accepted this testimony, finding that the Amlongs "did the best they could with a most difficult client and did not try to prolong the case or multiply these proceeding[s] to gain a tactical advantage."

The district court judge unequivocally rejected the magistrate judge's factual

findings and conclusions of law regarding both the Amlongs' subjective intent and their objective conduct. After directly quoting the magistrate judge's conclusions, the district court stated, "<u>The Court finds these conclusions to be based on an incorrect standard, incorrect interpretation of law, and not based on the record</u>" (emphasis added). The district court never explained how it thought the magistrate judge had misstated or misapplied the law, but the statement that the magistrate judge's conclusions were "not based on the record" clearly indicated that it was discarding his <u>factual findings</u>, including his critical credibility determinations, along with his legal conclusions. To find that the magistrate judge's findings were "not based on the record" was to say that the testimony told a completely different story.

Later in her order, the district court judge specifically found as a fact that an improper purpose lay behind the Amlongs' production of the errata sheet. Whereas the magistrate judge had concluded that the Amlongs had submitted the errata sheet for the legitimate purpose of advancing the truth, the district court saw the evidence another way:

> Plaintiff's counsel undertook efforts to 'repair the damage' Plaintiff's deposition caused, and filed the Errata Sheet in an effort to bolster testimony. . . . In contrast to [Karen Amlong's] testimony, . . . the Court's close examination of the 868 errata changes indicates a concerted effort to provide factual support to an otherwise meritless case. . . . Coupled with the complete lack of supporting evidence in this case, the nature and quantity of

38

entries on the Errata Sheet -- which bolstered inconsistencies or covered up falsities, and thereafter the Plaintiff's inability to factually support the errata changes at the subsequent deposition -- demonstrate bad faith and willful disregard for the judicial process by Karen Amlong, Esq., William Amlong, Esq., and Amlong & Amlong P.A.

This language was nothing less than a direct repudiation of the testimony that Amlong and her former colleague, Lisa Stern Taylor, gave at the evidentiary hearing, and, more importantly, the magistrate judge's abiding belief in the veracity of that testimony. While the magistrate judge was convinced, based on his hearing of the testimony, that the Amlongs prepared the errata sheet to cleanse the record of contamination and error and bring the court closer to the truth, the district court judge, who had not heard a single word of the testimony, concluded that the Amlongs were trying to breathe new life into a dead case for fraudulent or malevolent reasons. The district judge could not have interpreted the errata sheet as a way to "repair the damage," "bolster testimony," and "cover[] up falsities" without necessarily rejecting Karen Amlong's statement and, notably, the magistrate judge's finding that the Amlongs only wanted to "set the record straight" and present a truthful record. Quite simply, the two factual interpretations are impossible to reconcile in any practical sense -- where one sees diligence and fair play, the other sees underhanded scheming and malevolence. The district judge's analysis necessarily and expressly rejected the magistrate judge's

39

credibility findings.[5]

In a subsequent order denying the Amlongs' motion for reconsideration of the sanctions imposed, the district court again confirmed that it could make its own factual determinations based on the hearing transcript without taking the magistrate judge's findings into account at all. Norelus v. Denny's Inc., No. 94-2680-CIV-LENARD, slip op. at 6–7 (S.D. Fla. June 30, 2000) (order denying reconsideration). The district court made no mention of adopting the magistrate judge's credibility findings. Indeed, the district court expressly rejected the Amlongs' argument that the court "could not make factual findings contrary to those of the Magistrate Judge unless the Court first held an evidentiary hearing."

_____

[5]The dissent nevertheless concludes that the district court "adopted the magistrate's findings of fact." Dissenting Op. at 65. We are unable to read the district court's sanctions opinion that way. In the first place, the district court expressly told us in its sanctions order that the magistrate judge's determinations were "not based on the record," Norelus v. Denny's Inc., No. 94-2680-CIV-LENARD, slip op. at 20 n.9 (S.D. Fla. Mar. 21, 2000) (sanctions order). Moreover, and more important, the district court plainly found facts dramatically different from those found by the magistrate judge when it wrote that the Amlongs had filed the errata sheet "in an effort to bolster testimony," "to 'repair the damage,'" and, most notably, to "cover[] up falsities." Norelus v. Denny's Inc., No. 94-2680-CIV-LENARD, slip op. at 32–33 (S.D. Fla. Mar. 21, 2000) (sanctions order). This is not language even remotely consonant with the notion that Karen Amlong proceeded with an "empty head, but a pure heart," as the dissent would have it. To file an errata sheet in an effort to "cover[] up" a client's false testimony quite simply means to file the document knowingly and consciously in order to deliberately convey the false and misleading impression that a client's core testimony was true, when in fact the lawyer knew it to be false. See Webster's Third New International Dictionary 524 (2002) (noting that "cover up" means "to conceal something illicit, blameworthy, or embarrassing from notice : prevent one from being censured for error, laxity, or omission"). Indeed, the district court tells us that the Amlongs proceeded in "willful disregard for the judicial process" (emphasis added). This kind of fact finding goes far beyond a finding of recklessness. To do so without hearing a word of testimony, and in the face of the magistrate judge's contrary findings of fact and credibility determinations, undeniably constituted legal error.

40

The court cited Raddatz for the proposition that the governing statute, 28 U.S.C. § 636(b)(1), generally allows a district court to make its own findings without a hearing. While this was a correct statement of the general rule, the district court failed to take note of our precedents establishing an important exception to the rule: a district court may not override essential, demeanor-intensive fact finding by a magistrate judge without hearing the evidence itself or citing an exceptional justification for discarding the magistrate judge's findings.

Rejecting credibility findings made by a magistrate judge without holding a new hearing is permissible only when there is an "articulable basis for rejecting the magistrate's original resolution of credibility." Marshall, 609 F.2d at 155. The district court in this case did not cite any such articulable basis, nor is any such justification otherwise evident in this record. A determination of a lawyer's bad faith is particularly sensitive to demeanor and other intangible cues often not reflected in a transcript.

Discarding the magistrate judge's credibility findings without rehearing the relevant testimony amounted to an impermissible shortcut that rendered the result invalid and an abuse of discretion. Cf. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law . . . ."). Whether the Amlongs' objective

41

conduct amounted to bad faith was a mixed question of law and fact. The Amlongs' intent and purpose at each stage of the litigation was a major factor in evaluating their conduct objectively. The district court judge's factual determination that the Amlongs had either intentionally avoided learning the truth or had intentionally prolonged the proceedings was an integral part of her determination that the Amlongs' objective conduct reached the level of bad faith.

We are, therefore, constrained to reverse the district court's March 21, 2000, order to the extent that it required the Amlongs to pay the costs the defendants incurred because of the continuation of litigation past June 20, 1996. On remand, the district court need not conduct a new hearing. It may accept the magistrate judge's basic findings of fact and then reach its own determination as to whether the lawyers' conduct was objectively unreasonable and vexatious. Alternatively, the district court may, if it so chooses, conduct its own hearing as a prelude to making a new determination. Our holding is simply this: the district court abused its discretion and clearly erred when it squarely rejected the magistrate judge's findings of fact and credibility determinations and substituted its own, without hearing so much as a single witness at a sanctions hearing. We do not mean to imply that it would have been an abuse of discretion for the district court to have imposed sanctions even in the absence of subjective bad faith. That issue is simply

not before us today.

III.

The second component of the sanctions the district court imposed on the Amlongs was an order to pay $18,599.76 in fees and costs incurred in reopening Norelus's deposition. The Amlongs argue that the district court acted improperly in imposing this sanction as well.

The district court initially imposed this sanction on Norelus alone in its August 26, 1996, order, under the court's inherent powers. The district court then made the Amlongs jointly and severally liable for this sanction in an October 16, 1996, order clarifying its earlier order. In its March 21, 2000, order, the district court found that the plaintiff and the Amlongs had failed to pay fees and costs for reopening the deposition. The court again ordered the Amlongs to pay those fees and costs and ordered the Amlongs to pay 10 percent back interest as an additional sanction for the Amlongs' failure to pay the costs earlier.

The Supreme Court has stated that "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991). With this in mind, we have held that before a court can impose sanctions on an attorney under its inherent powers, it must make a finding of bad faith. Thomas v. Tenneco Packaging Co., 293 F.3d 1306, 1320 (11th

43

Cir. 2002) ("[B]efore a court can impose sanctions against a lawyer under its inherent power, it must find that the lawyer's conduct 'constituted or was tantamount to bad faith.'" (quoting Durrett v. Jenkins Brickyard, Inc., 678 F.2d 911, 918 (11th Cir. 1982))); In re Mroz, 65 F.3d 1567, 1575 (11th Cir. 1995); see also Roadway Express, Inc. v. Piper, 447 U.S. 752, 767 (1980) (noting that "[a] specific finding as to whether counsel's conduct in this case constituted or was tantamount to bad faith . . . would have to precede any sanction under the court's inherent powers").

The district court did not make any valid finding of bad faith that could have supported this component of the sanctions. The district court did not make a finding of bad faith conduct by the Amlongs either in its August 26, 1996, order requiring Norelus to pay the fees and costs associated with reopening the deposition, or in its October 16, 1996, order making the Amlongs jointly and severally liable for the costs.

The March 21, 2000, order also did not render the sanctions valid. As we have already explained, in concluding in its March 21, 2000, order that the Amlongs' conduct amounted to bad faith for purposes of § 1927, the district court improperly discarded the findings of fact made by the magistrate judge and substituted its own. As we also explained, the threshold of bad faith conduct for

44

purposes of sanctions under the court's inherent powers is at least as high as the threshold of bad faith conduct for sanctions under § 1927. See Cordoba v. Dillard's Inc., 419 F.3d 1169, 1178 n.6 (11th Cir. 2005). So sanctions that are impermissible under § 1927 are also impermissible under a district court's inherent powers. We are, therefore, also constrained to find that neither the August 26, 1996, order originally imposing the sanctions, the October 16, 1996, order making the sanctions jointly payable by the Amlongs, or the March 21, 2000, order repeating the sanctions order contained a valid imposition of sanctions under the court's inherent powers. Accordingly, we reverse the portion of the March 21, 2000, order that required the Amlongs to pay the costs of reopening the deposition.

The final remaining component of the challenged sanctions is the district court's order requiring the Amlongs to pay 10 percent back interest on the $18,599.76 amount. The court imposed this as an additional sanction on the Amlongs for having failed to comply with the October 16, 1996, order. However, the district court never determined that the Amlongs had failed to comply with the October 16, 1996, order in bad faith. Accordingly, the order to pay back interest also was necessarily an abuse of discretion and must be reversed.

REVERSED AND REMANDED.

45

HILL, Circuit Judge, dissenting:

In view of the majority's amendment of the panel opinion, I strike the introductory paragraph of the original dissent, substitute the following, and leave the remainder unchanged.

The panel's amended opinion appears to me to be designed to limit its holding to the narrow proposition, already the law in this circuit, that a district court judge may not reject a magistrate judge's credibility findings without a hearing. The reaffirmation of this proposition is, in the revised opinion, now totally divorced from the facts of this case, from the legal standards applicable to Section 1927 sanctions, and from the validity *vel non* of the district court's holding that the Amlongs' conduct was sanctionable. Surely, we have not labored so long for so little.

The narrowing of the majority's holding by the revised opinion does, however, in my view, clearly illuminate the error inherent in the remand – it is not required. It is now clear that all concerned agree on the *facts* concerning the Amlongs' conduct of this case. All further agree that the correct *legal standard* to be applied in this case is an objective one. Finally, all agree that the *issue* that must be resolved in this case is whether it was objectively reasonable for the Amlongs to have conducted this case in the manner in which they did.

This is what the magistrate judge initially did. He found the underlying claim to have been patently frivolous and the Amlongs' actions in pursuit of the claim to have grossly transgressed our rules governing the conduct of litigation. He went on, however, to adopt the erroneous view that a lack of subjective bad faith on the part of counsel could immunize their objectively bad conduct from sanctions.

This is not the law in our circuit and the district court quite rightly refused to adopt this conclusion. She held that, having found the conduct to be objectively unreasonable, it was within her discretion to sanction the Amlongs, and she did.

No one now suggests that it was not within her authority to do so. The majority's revision makes clear that the district court would not abuse her discretion on remand should she reimpose sanctions

46

*without any finding whatsoever* as to the Amlongs' subjective good or bad faith. In this circuit, the statute permits the district court to impose sanctions without considering counsel's subjective state of mind.

It is error, then, to hold that remand is *required* because the district judge *may* have (we do not know since she made no finding on this issue) disagreed with the magistrate judge on the issue of the Amlongs' subjective good faith in the conduct of the case. How can such a remand be required when all now agree that this issue is not necessary to the resolution of this case.

I continue to dissent, respectfully, to the vacation of the district court's order and remand. I should affirm.

I.

The district judge in this case sanctioned the plaintiff's attorneys, Karen and William Amlong and their law firm, under 28 U.S.C. § 1927, for their unreasonable and vexatious pursuit of their client's patently frivolous claim. For the past ten years, the parties have litigated the award of these sanctions.

The magistrate judge conducted an extensive evidentiary hearing on defendants' motions for sanctions over the course of four days, producing a 500-page evidentiary record and a sixteen-page Report and Recommendation. The district court conducted its own *de novo* review of the motions and issued a thirty-seven page order awarding sanctions. The Amlongs moved for reconsideration, to which the defendants were forced to respond, and the district court issued another order reaffirming the award.

47

Subsequently, the matter was referred to a different magistrate to determine the amount of the award. After still more evidentiary hearings, the magistrate issued his Report and Recommendation on the amount of sanctions to be awarded. The Amlongs objected. After another *de novo* review, the district court entered a monetary judgment. The Amlongs appealed.

As the Amlongs concede, "[from 1996] to the time this appeal was filed, the only issue before the lower Court was resolution of two motions for sanctions against counsel representing the Plaintiff." Despite these ten years of litigation on the sole issue of sanctions, and the enormous amount of judicial resources that the judges of the Southern District of Florida have already invested in deciding this issue, the majority today announces that the job is not done.

The majority instructs the district court that it abused its discretion by not having yet another evidentiary hearing, this time to listen to Karen Amlong testify to her good intentions in the conduct of this litigation. Since the law of this circuit does not permit the district court to consider her subjective good intentions in deciding the issue of sanctions, I respectfully dissent from the holding that the district court erred in not hearing the testimony.

Even more importantly from an institutional point of view, our holding today will revise the binding law of this circuit to substitute a subjective test for the

48

objective one that we now apply in deciding whether counsel's conduct may be sanctioned under Section 1927. This substitution will eviscerate the ability of our district courts to sanction exactly the sort of conduct that the district court in this case found to be a reckless abuse of the judicial process. Since a panel of this court may not undertake such a revision, I cannot join the opinion.

II.

Although the facts are recited in the majority opinion, there are some substantive omissions that I believe must be included, so I begin with the underlying action.

A.    *The Underlying Action*

Floride Norelus, a citizen of Haiti, illegally entered the United States in 1992. In June of 1993, using her cousin's name, Lavictore Remy, and social security number, Norelus was hired to work at a Denny's restaurant as a dishwasher.[1] She claims that shortly thereafter Asif Jawaid, the manager of the restaurant, and his roommate Raheel Hameed began to sexually assault her, both at the restaurant and at Jawaid's home. She quit her job in May of 1994.

She reported the alleged assaults to both the owners of the restaurant and the

---

[1]Norelus admitted to completing a false Immigration and Naturalization Service I-9 Employment Eligibility Form in connection with her Denny's application, using the name of her cousin, "Lavictore Remy." She also admitted to filing false 1993 and 1994 income tax returns under the same name.

police.  The owners of the restaurant conducted a prompt remedial investigation,

finding her charges baseless.[2]  The police also conducted an investigation, but, as

the Amlongs concede in their brief, found "inconsistencies and conflicts" in

Norelus's allegations, resulting in the State Attorney's refusal to prosecute.

In December of 1994, Norelus filed suit against Jawaid, Hameed and the

various corporate defendants.  Her complaint alleged, *inter alia*, that she was raped

with a hairbrush, repeatedly forced to have oral, vaginal and anal intercourse in the

restaurant, and kidnapped and taken to Jawaid and Hameed's home where she was

restrained and repeatedly raped by both of them.  The district court characterized

the complaint's allegations as "extraordinarily lewd, lascivious, and sexually

graphic."

Joseph A. Chambrot signed this original complaint.[3]  Chambrot later

testified that he made no inquiry into Norelus's factual allegations that he included

in the complaint, relying rather on his conclusion that Norelus "looked like a

victim," and that she appeared afraid and "looked like someone who had been

---

[2]As to the relevance of this fact, the Amlongs state in their brief that "[v]irtually every employment case that we have has a prompt remedial investigation that shows no liability.  If that stopped us we would never try a case."

[3]Norelus had originally consulted with Debra Valladares.  Valladares, who knew little about Title VII claims, associated Chambrot, an attorney with trial experience.

raped."[4]

Norelus's original complaint was replaced with an amended complaint in July of 1995, and a second amended complaint in February of 1996. Both of these complaints were signed by Karen Amlong.[5] Amlong later testified that neither she nor anyone else at her firm interviewed a single fact witness prior to the filing of the amended complaints.

As discovery progressed, the defense lawyers took the depositions of thirteen people Norelus identified in her sworn interrogatory responses as having witnessed the sexual attacks. The Amlongs concede in their brief on appeal that, after these depositions, "it was clear that there was not one witness who would collaborate [sic] her charges of sexual abuse." The defense attorney, who deposed

[4]Nor did Chambrot rely on any investigation conducted by Valladares. Valladares testified that, prior to undertaking to represent Norelus, she spoke only with Norelus, her two brothers, and David Hill, a former client who brought Norelus to her. (Valladares testified that she had defended Hill against allegations that he committed assault and sexual harassment while a Denny's employee. Hill settled the lawsuit with a monetary payment to the plaintiff.) Subsequently, Valladares spoke with only two potential witnesses – Edmund Reed and John Green. Neither of these two men witnessed any sexual harassment of Norelus by Jawaid or Hameed. Green, a regular patron of Denny's, told Valladares that he felt sorry for Norelus because she was made to clean bathrooms and Jawaid seemed to treat her as a "slave." When defense counsel deposed him later (with an Amlong attorney present), Green testified that a "female attorney" who identified herself as Norelus's attorney offered him money for false testimony supporting Norelus's claim, but he refused. Green did not remember her name, and he died before the sanctions hearings.

[5]Chambrot was familiar with another pending sexual harassment suit against a different Denny's restaurant filed by Karen Amlong, and referred the Norelus matter to Amlong prior to filing the original complaint, but no retainer agreement had been executed, so Chambrot signed that complaint. The Amlongs commenced their formal representation after receiving the retainer agreement some two months later.

these witnesses, testified that the depositions revealed that:

> None of these witnesses ever saw [Jawaid] touch the plaintiff in a sexual way, they never heard any sexual comments, they never saw him follow her into the men's room, where she claimed she was allegedly forced to perform oral sex, and, significantly, she never complained about Mr. Juad [sic] to any of these people.

Amlong later told the district court that neither she nor anyone in her firm ordered a copy of or read a single one of these deposition transcripts prior to the sanctions hearing. Amlong explained that it was her frequent practice not to interview fact witnesses, even those testifying for her client, prior to trial because they usually lied.

After the witnesses' depositions, Norelus herself was deposed in August of 1995, and thereafter over the course of several days in January and February of 1996. During the deposition, Norelus insisted that her two brothers serve as translators. Throughout the deposition, the brothers would interpret the "meaning" of questions as well as the actual question, and simultaneously confer with Norelus's counsel.

From the outset, Norelus's testimony and conduct during the deposition called into question the validity of her claims. She not only forgot key details alleged in her complaints but provided several inconsistent versions of events, and even outright falsehoods. For example, in August of 1995, when asked about the

52

name "Lavictore Remy," the name she used in applying to Denny's, she stated that she made up that name and did not know anyone by that name. She repeated this statement at the continuation of her deposition in January 1996. Again, she specifically denied having any relative or cousin by that name. Shortly after this exchange, she became belligerent and agitated, and her counsel (an Amlong associate) requested a break so that Norelus could "calm down." Upon returning from the break, Norelus's counsel admitted that Norelus did have a cousin named Lavictore Remy. When Norelus was asked why she had lied, she responded "What's wrong with that?"

Even more disturbing, Norelus's deposition testimony directly contradicted many of the allegations in her own complaint, including: (1) allegations of oral, vaginal, and anal intercourse in a walk-in freezer (deposition testimony that no sex occurred in walk-in cooler or freezer); (2) allegations of sexual intercourse inside the Meos restaurant (deposition testimony that no sexual intercourse occurred in that restaurant); (3) allegations that the managers retaliated against Norelus after she complained to the Meos owners about sexual harassment (deposition testimony that no retaliation occurred because she did not complain until after her resignation); and (4) allegations of required medical treatment for the hairbrush rape (inability in deposition to provide the name of health care facility where

53

treatment occurred).[6]

Instead of providing support for her claims, Norelus's deposition testimony further undermined her credibility by expanding her list of unsubstantiated allegations, including that she was forced to have oral sex with Jawaid every day she worked at the restaurant between June of 1993 and May of 1994, and that she had slept with over 1000 men. The district court later noted that Norelus's testimony was "so replete with falsities, misrepresentations and contradictions that no reasonable person could have believed the allegations."

Apparently, Norelus's counsel were concerned as well, because they had her polygraphed twice – once, during her deposition, and again afterward.

In June of 1996, three weeks before trial was to commence, the Amlongs served an "Errata Sheet" on all defendants. This "sheet" was sixty-three pages long, and, as the majority concedes, undertook to make 868 "corrections" to Norelus's sworn deposition testimony. It explained these changes as the result of her failure to understand what was being asked or poor translations by the interpreter (her brothers).[7]

---

[6]Nor was there every any other sort of evidentiary support for these allegations.

[7]The Errata Sheet was the product of a conference attended by an associate of the Amlong firm, Norelus and her two brothers (also identified by her as fact witnesses). Norelus's brothers not only translated the deposition, but interpreted and "clarified" the meaning of the deposition questions and Norelus's prior answers.

Many "corrections," however, were not mere scrivener or translation "errors." Rather, these changes involved the substantive *replacement* of one sworn answer with an entirely *different* answer. Many of these changes, explained as "clarification of response," supplied material details that Norelus was totally unable to remember at her deposition.

For example, Norelus's complaint alleges that Hameed kidnapped her and took her by car to his house, where she was restrained and repeatedly raped by both Hameed and Jawaid. At her deposition, she was asked numerous times but could neither describe the car, nor the route that Hameed took when driving to the house. In the Errata Sheet, however, Norelus's answer was changed and great detail was provided about both the car and the exact route that Hameed took to his house. This new information included many street names and precise ordinal directions for the route. In addition, her deposition testimony regarding an assault by Jawaid was almost completely changed to provide much greater factual detail. Her testimony that she could not remember the color or material of the hairbrush used to sodomize her, was replaced in the Errata Sheet with the color – light to medium brown – and the material – wood. *See* Errata Sheet Excerpt, *Norelus*, 2000 WL

33541630, at *3, attached hereto as Appendix A.[8]

Other corrections the Errata Sheet sought to make to Norelus's deposition testimony were the exact opposite of her previously sworn testimony, changing "wrong" answers to "correct" answers that were consistent with the allegations of her complaint. Her deposition answer "no" to the question whether she was ever forced to have anal sex, was changed in the Errata Sheet to "yes," as alleged in her complaint. Her deposition testimony that she did not remember anything that she told the police about the assaults was replaced in the Errata Sheet with a recollection that she told the police that the managers sexually assaulted her. *Id.*

After receiving the Errata Sheet, defendants moved to dismiss the case, arguing that it constituted an attempt to work a fraud on the court. The district court denied the motions, but, due to the obvious inconsistencies and "highly suspicious" nature of the Errata Sheet, ordered Norelus to resubmit to deposition.

In September of 1996, at the reopened deposition, Norelus again had no recollection of the facts the Errata Sheet had sought to make part of her deposition testimony. In addition, it became clear that some of the language in her new sworn

---

[8]The district court prepared an excerpt from the Errata Sheet highlighting some of the 868 changes. It is attached hereto as Appendix A. The entire sixty-three page Errata Sheet was appended to the district court's order awarding sanctions. *See* 2000 WL 33541630 at *Appendix A.

testimony was not even hers at all, because she was unable to explain the meaning of certain words in her changed answers.[9] Norelus admitted that she had lied in her original sworn testimony, but was again unable or unwilling to testify consistently or provide any credible factual support for her claims.[10]

The district court ordered Norelus and/or the Amlongs to pay the fees and costs associated with the reopened deposition, and to file an appendix identifying the original testimony, the changes contained in the Errata Sheet, and detailed explanations for the changes. Neither Norelus nor the Amlongs ever complied with either aspect of the district court's order, and, in December of 1996, the court dismissed the case.[11]

B.     ***The Sanctions Motions***

After the case was dismissed, the defendants moved, under 28 U.S.C. § 1927 and the inherent power of the court, for the award of sanctions against Norelus and the Amlongs. Section 1927 codifies the "bad faith exception" to the American rule that litigants pay their own fees and costs. *Roadway Express, Inc., v. Piper*, 447

---

[9]The district court found that many statements in the Errata Sheet could not fairly be attributed to Norelus herself.

[10]The Amlongs concede in their brief that "[t]he [deposition] finally came to an end on the third day when . . . all counsel reached an implicit understanding that little purpose would be served in continuing the process."

[11]At this point, the Amlongs withdrew from her representation.

U.S. 752, 766 (1980); *Avirgan v. Hull*, 932 F.2d 1572, 1582 (11th Cir. 1991). It permits the district court to sanction counsel for the bad faith pursuit of meritless claims. *Schwartz v. Millon Air, Inc.,* 341 F.3d 1220, 1225 (11th Cir. 2003). Such sanctions are especially appropriate where counsel takes frivolous legal positions supported by scandalous accusations. *Blair v. Shenandoah Women's Center, Inc.,* 757 F.2d 1435, 1438 (4th Cir. 1985).

Defendants' motions for sanctions contended that the Amlongs conducted this litigation in bad faith by 1) failing to investigate Norelus's allegations prior to filing any of the complaints, but especially after her deposition revealed her inability to credibly support her own claims; 2) ignoring record evidence demonstrating that her claims were meritless; and 3) filing an improper errata sheet in order to unreasonably and vexatiously prolong this litigation.

In January of 1997, defendants' motions were referred to the magistrate judge for a report and recommendation. Karen Amlong testified at the hearing to her conduct of the case, her belief in her client and her good intentions in the pursuit of Norelus's claim.

In February of 1998, the magistrate filed his Report and Recommendation. He found that Norelus's claim was frivolous because it was "unreasonable and without factual foundation," and "always lacked credible evidence, or any evidence

other than plaintiff's own unreliable recollections." In support of his recommendation that attorney's fees and costs be awarded against her, he specifically found that:

> Here, plaintiff presented only her own changing testimony, without corroboration or support from any other witnesses or sources, which was totally or nearly totally discredited by plaintiff's numerous lapses of memory, outright lies, outlandish comments made during her deposition . . . .

With respect to the Amlongs, the magistrate found that:

> Plaintiff's counsel accepted and believed [Norelus's] allegations based almost exclusively on plaintiff's own recollections and initial corroboration from plaintiff's brother and a third person, and proceeded to file this lawsuit on that basis . . . . Almost immediately thereafter, plaintiff's allegations began to appear questionable, even to plaintiff's attorneys, due to plaintiff's several falsehoods during her deposition regarding her name, social security number and other seemingly insignificantly [sic] matters. More importantly, plaintiff's listed witnesses, including her own family members, friends, and coworkers at Denny's, all testified contrary to plaintiff's version of the facts so that plaintiff was soon left with only her own testimony to support her claims.

The magistrate rejected the idea that the polygraph examinations excused the continued prosecution of the case, finding that "plaintiff's claims were not strengthened in any manner by the polygraph examinations she passed which seemed only to demonstrate her own attorneys' lack of trust in the allegations of the client."

59

The magistrate further found that the "preparation of the errata sheet and the procedures used to do so (i.e., translation by plaintiff's brothers and possible explanations of questions by plaintiff's counsel) was improper and should have not occurred." Furthermore, "the numerous changes listed in the errata sheet only illuminated plaintiff's difficulty or inability to relate a consistent account of events underlying her claims."

Ultimately, however, the magistrate recommended against sanctions for the Amlongs. He concluded that "their decision to press on with the litigation despite warnings from defendants' counsel that the case lacked merit and might result in sanctions" was because they "genuinely believed that plaintiff's claims were meritorious despite plaintiff's inability to testify completely and truthfully about several aspects of her case." After hearing Karen Amlong testify to her good intentions in the conduct of this case, the magistrate concluded that he could find no "bad faith, improper motive or reckless disregard of duty" that would justify sanctions.[12]

C.    *Sanctions by the District Court*

---

[12]All defendants filed timely objections to the magistrate's Report and Recommendation. The Amlongs did not file any objections to the Report and Recommendation, and they do not now contest the district court's findings of fact, with the exception of the ultimate fact that their conduct was reckless, in any material way.

After its *de novo* review, the district court held that the magistrate's "findings of frivolity, lack of investigation, lack of corroborating evidence, and presence of contradictory evidence" all militated in favor of the award of sanctions against the Amlongs, and that the magistrate's recommendation to the contrary was "based on an incorrect standard, incorrect interpretation of law, and not based on the record."

The magistrate applied an erroneous legal standard to the Amlongs' conduct by permitting Karen Amlong's subjective good intentions to trump what he had already found to be her objectively "improper" conduct. The correct standard for the imposition of sanctions in this circuit, the district court held, is an objective one which evaluates counsel's conduct, not her subjective state of mind.

Furthermore, the district court held, the magistrate's findings should have led him to the conclusion that the Amlongs' "improper" conduct was reckless. The magistrate's conclusion to the contrary was not, the district court held, consistent with or based upon the record (as the magistrate himself had already found it to be).

To demonstrate this, the district court catalogued the magistrate's findings of fact regarding the Amlongs' conduct as outlined in his Report and Recommendation:

61

(1) Norelus's *claim* was *frivolous* because it "always lacked credible evidence, or any evidence other than plaintiff's own unreliable recollections;"

(2) Norelus's "listed *witnesses*, including her own family members, friends, and coworkers at Denny's, *all testified contrary* to plaintiff's version of the facts so that plaintiff was soon left with only her own testimony to support her claims;"

(3) her deposition was filled with "numerous lapses of memory, outright lies, [and] outlandish comments;" (3) *the Amlongs "accepted and believed [Norelus's] allegations based almost exclusively on plaintiff's own recollections;"* and

(4) the "preparation of the *errata sheet* and the procedures used to do so was *improper* and should have not occurred." (all emphases added)

In the context of these undisputed facts, and the magistrate's own finding of impropriety, his failure to find the Amlong's conduct reckless was not, the district court said, based upon or permitted by the record. A correct application of the objective test to these facts, said the district court, results in the following conclusions of law:

(1) The Amlongs' decision not to investigate Norelus's allegations, after her witnesses failed to support her claim, and certainly after her own falsehood-riddled deposition, constituted a *reckless disregard* for the merits of her claim.

(2) At least after Norelus's deposition, the Amlongs should have known that her claim was very likely *frivolous*.

(3) The Amlongs' decision to continue to pursue a frivolous claim by filing the Errata Sheet was *unreasonable and vexatious* and

62

*multiplied the proceedings unnecessarily.* (all emphases added)

Accordingly, the court imposed Section 1927 sanctions on the Amlongs and their law firm[13] from June 1996 (the date of the Errata Sheet) through March 21, 2000 (the date of the sanctions order).

The Amlongs make three arguments on appeal: that the district court erred in applying an objective standard to their conduct; that the district court abused its discretion in concluding that the Amlongs' conduct met this standard ; and that the award of attorney's fees and costs for the sanctions proceedings themselves was also an abuse of discretion.[14]

III.

A. ***Section 1927 sanctions may be imposed for objectively reckless conduct regardless of counsel's subjective intent.***

Section 1927 permits the district court to sanction litigation conduct that "unreasonably and vexatiously" multiplies the proceedings. We have long held that "bad faith is the touchstone" for the imposition of sanctions under the statute. *Schwartz*, 341 F.3d at 1225. Recently, we made clear that this bad faith is to be found in counsel's *objective* conduct, not in her *subjective* state of mind. *Id.*

---

[13]Authorized by *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1544 (11th Cir. 1993).

[14]The majority opinion does not address the second or third issue at all.

Under the objective test, according to the majority, "the district court must compare the attorney's *conduct* against the *conduct* of a 'reasonable' attorney and make a judgment about whether the *conduct* was acceptable according to some objective standard" (emphasis added). In this circuit, litigation conduct may be sanctioned if it is reckless – "by which we have mean . . . a gross deviation from conduct that might be reasonable in the circumstances." *Schwartz*, 341 F.3d at 1227.

After having so carefully established that the appropriate test for Section 1927 sanctions in this circuit is objective, not subjective, with citation to no less than fourteen cases, the majority then proceeds to advance the proposition – *without citation to a single authority* – that under the objective test:

> [A] district court may impose sanctions for egregious conduct by an attorney even if the attorney acted *without the specific purpose or intent* to multiply the proceedings. *That is not to say the attorney's purpose or intent is irrelevant.* Although the attorney's objective conduct is the focus of the analysis, the attorney's *subjective state of mind is frequently an important piece of the calculus*, because a given act is more likely to fall outside the bounds of acceptable conduct and therefore be 'unreasonabl[e] and vexatious[]' if it is done with a malicious purpose or intent (emphasis added).

Quite clearly, this is not an accurate description of the objective test. Under the objective test for bad faith, counsel's subjective intentions are *never* "frequently an important piece of the calculus" in evaluating counsel's *objective*

64

*conduct*. We have explicitly so held. *Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1508 (11th Cir. 1993) ("'The court should determine objectively the propriety of sanctions without conducting an exploration of the attorney's subjective intentions'" (quoting Debbie A. Wilson, Note, *The Intended Application of Federal Rule of Civil Procedure 11: An End to the "Empty Head, Pure Heart" Defense and a Reinforcement of Ethical Standards,"* 41 Vand. L. Rev. 343, 373 (1988). The majority opinion even concedes elsewhere that, "it is clear from the statutory language and the case law that for purposes of § 1927, *bad faith turns not on the attorney's subjective intent, but on the attorney's objective conduct*" (emphasis added). It is counsel's conduct, not her intentions, that is the focus of our inquiry.[15]

The district court's determination whether that conduct "falls outside the bounds of acceptable conduct" is governed by well-established circuit precedent. Certain litigation conduct is permissible under our law; other conduct is forbidden. Sanctions may be imposed where counsel's conduct was forbidden.

---

[15]Of course, counsel's *bad* intentions, in a particular case, if proved, may become a factor in the district court's ultimate decision to *sanction*. But this is *not*, as the majority asserts, because those subjective intentions are somehow relevant to our evaluation of her objective conduct. On the contrary, counsel's bad intentions remain irrelevant to that evaluation. The district court must first determine whether counsel's conduct was objectively reckless. Having so found, the district court has the discretion to sanction that conduct or not. Clearly, the presence of actual bad faith in a case might tip the balance in favor of sanctions.

Conduct remains forbidden even if counsel acted with the best of intentions – for example, helping her client in whom she honestly believed, press a claim contradicted by all the available evidence and supported by none. Under the objective test, a district court *may not* excuse counsel's reckless conduct because she acted with an "empty head, but a pure heart." *Souran,* 982 F.2d at 1508. *See also Margo v. Weiss*, 213 F.3d 55, 64 (2d Cir. 2000) (the objective standard eliminates any empty-head, pure-heart justification for patently frivolous arguments); *Thornton v. Wahl*, 787 F.2d 1151, 1154 (7th Cir. 1986) (under the objective test for sanctions, "[a]n empty head but a pure heart is no defense"). "To excuse objectively unreasonable conduct by an attorney would be to state that one who acts 'with 'an empty head and a pure heart' is not responsible for the consequences.'" *Braley v. Campbell*, 832 F.2d 1504, 1512 (10th Cir. 1987) (quoting *McCandless v. Great Atlantic and Pacific Tea Co.*, 697 F.2d 198, 200 (7th Cir. 1983)). This is not the law in the Eleventh Circuit. In our circuit, as in most others, Karen Amlong's pure heart may not excuse her bad conduct, if it was bad.

The district court correctly reviewed the Amlongs' conduct to determine whether it was objectively reckless. In so doing, it adopted the magistrate's findings of fact – undisputed and, indeed, *defended* by the Amlongs – that they

66

conducted no independent investigation of the facts underlying Norelus's claim,[16] that there was no evidentiary support for Norelus's allegations,[17] that there was much evidence contradicting her allegations,[18] that Norelus's deposition was replete with falsehoods, contradictory testimony[19] and did not factually support the allegations of her own complaint,[20] and, finally, that in response to this set of circumstances, the Amlongs did not dismiss the claim but rather chose to prepare and file an 868 item errata sheet that materially changed their client's sworn testimony.[21] The district court concluded that this conduct is forbidden in our circuit, and, therefore, objectively reckless.

The majority, however, never even discusses these facts or their legal consequences. There is no discussion whatsoever in the majority opinion of whether the Amlongs' conduct was objectively reckless. There is no case on whether what they did to investigate Norelus's claim was reasonable under the law. There is no case on whether the Amlongs may reasonably choose to rely on their

---

[16]Because witnesses usually lie.

[17]Because such attacks normally do not occur where others can see them.

[18]Because witnesses usually lie.

[19]Because she was confused.

[20]Because there were translation errors.

[21]Because they wanted to set the record straight.

belief in their client's story to the exclusion of any other investigation. There is no case on whether the Amlongs' continued pursuit of Norelus's claim was reasonable when it became clear there was no evidentiary support for it and much contradictory evidence. There is no case on whether, after a deposition that all agree with riddled with falsehoods, contradictory testimony and which almost completely failed to support the allegations of the complaint, the Amlongs' decision to prepare and file a 868 item "errata sheet" materially changing their client's sworn testimony was acceptable litigation conduct. There is simply no discussion whatsoever about whether these facts support the award of sanctions.

Instead of such a discussion, the majority takes the position that these facts do not exist. According to the majority, the district court rejected the magistrate's finding that the Amlongs filed the Errata Sheet in a good faith attempt to, as Karen Amlong testified, "set the record straight." Instead, the majority complains, the district court found that they filed the errata sheet to "bolster the testimony," "repair the damage," and "coverup falsities." The majority holds that the district court "clearly erred" when it "rejected the magistrate's findings of fact and credibility determinations . . . without a hearing." In the majority 's view, the case must be remanded in order for the facts to be found.

This view is mistaken. It is rooted in the majority's failure to distinguish

between findings of fact regarding what the Amlongs did and credibility findings regarding their subjective good intentions in doing it. To the extent that the district court reached any conclusions about the Amlongs' subjective intentions (there is no finding of actual bad faith in its opinion), and to the extent that these conclusions conflict with those of the magistrate, the conclusions are *dicta* and the conflict irrelevant. The statute requires the district court to evaluate Karen Amlong's *objective* conduct – not her *subjective* state of mind. Having determined that *what* she did was reckless, the district court's speculation as to why she did it is pure *dicta*. Even the majority recognizes this when it noted that the district court made these "factual findings" about her subjective intentions because it "*felt obliged to justify its determination of objective bad faith*" (emphasis added). Credibility findings regarding irrelevant testimony do not constitute reversible error. No remand is necessary to resolve a conflict between the district court and the magistrate that is irrelevant to the outcome of this case.

As opposed to its *speculation* about Karen Amlong's subjective state of mind, the district court's *holding* is that the Amlongs' objective conduct was reckless. With respect to this conduct, all agree as to the facts. The district court *adopted*, rather than rejected, the magistrate's findings of fact concerning what the

Amlongs did in their pursuit of Norelus's claim.[22]  Even the Amlongs do not

dispute these facts.  On the contrary, as we have seen above, they vigorously

defend their conduct.  Therefore, no remand is necessary to find these facts.  These

facts do not depend upon Karen Amlong's credibility.

The only fact that depends upon Karen Amlong's credibility is her claim to

good intentions in doing what she did.  Since this fact is irrelevant to the

determination of her objective conduct, what is the point of remand?

The majority professes to agree that, under an objective test, even *fully*

*credited* good intentions may not excuse otherwise blameworthy conduct.  But

implicit in its insistence that Karen Amlong's testimony must be heard is the belief

that even if the things she did in pursuit of Norelus's claim were *forbidden*, these

things are *permitted when done with good intentions*.  This belief is reflected

throughout the majority's opinion, which contains not one word about the

objective recklessness of the Amlong's conduct, but exhaustively catalogues their

---

[22]Even if the district court had rejected the magistrate's fact findings, however, it would have committed no error.  In its *de novo* review of the sanctions motions, the district court is entitled to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *United States v. Raddatz*, 447 U.S. 667, 673-74 (1980).  Furthermore, in its review,"Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on the magistrate's proposed findings and recommendations." *Mathews v. Weber*, 423 U.S. 261, 273 (1976)*.*  Nor is the district court required to rehear the evidence. *United States v. Marshall*, 609 F.2d 152, 155 (5th Cir. 1980) (district court may base factual determinations on record, including transcript of hearing before judge).

70

good intentions.

But this is not the law.  No amount of good intentions can legitimize otherwise forbidden litigation conduct.  If what counsel has done transgresses permissible bounds, counsel may not plead good faith in doing it.  Were that not so, counsel who knows that his client ought, in justice, win the case could claim good faith in suborning perjury to achieve that success.

Similarly, in this case, the Amlongs "knew" that Norelus's story was true and that she should prevail in her claim.  They *believed* her.  Therefore, they filed her claim without any investigation whatsoever.  They chose not to depose a single witness.  After the defense depositions, when it became clear that every fact witness identified by Norelus had not only failed to support, but, in fact, contradicted her story, they continued their pursuit of her claim.  After Norelus's falsehood-riddled deposition, which failed to support the allegations of her own complaint, the Amlongs chose not to abandon their pursuit of her claim, but instead prepared and filed an 868 item errata sheet that, as the majority itself acknowledges, materially changed – even contradicted – Norelus's previously sworn testimony.

The law in this circuit, which the majority never even mentions, is that such litigation conduct is objectively reckless and sanctionable.  Despite Karen

71

Amlong's testimony that she did these things because there usually are not witnesses to such events or the witnesses usually lie, that she believed Norelus's story, that others believed it too, and that she filed the errata sheet to "set the record straight," our cases condemn such litigation conduct regardless of the reasons for it. Case after case in this circuit unequivocally holds that an utter failure to investigate does not satisfy counsel's duty to the court – even if counsel considers such investigation fruitless. Case after case holds that reliance on a belief in one's client without more is not enough to satisfy counsel's duty to the court – regardless of the strength with which such a belief is held. Our cases are unanimous that an errata sheet that makes wholesale changes to a plaintiff's sworn deposition testimony is both improper and an abuse of the judicial process – regardless of the motive in doing so.

So, having good intentions cannot make permissible what is forbidden. The majority offers not one case in which testimony about counsel's subjective good intentions was held to be even relevant to, much less determinative of, the objective recklessness of counsel's conduct. I suggest there is not one.

If the Amlong's conduct is forbidden by our cases, as both the magistrate and the district court held, then remand for reconsideration of that conduct in the light of Karen Amlong's good intentions is unnecessary.

We have specifically so held. In direct conflict with the majority opinion, we have held that, under Section 1927, no remand to the district court is necessary where the record contains the facts of counsel's objective conduct because, under the objective test, we may review the propriety of that conduct *without* testimony or findings regarding counsel's subjective intentions. *Souran*, 982 F.2d at 1508 (the court should determine the propriety of sanctions objectively without conducting an exploration of the attorney's subjective intentions). Under *Souran*, the findings of fact in the record of this case are more than sufficient to permit our review of the district court's decision to sanction. *Id.*[23]

The district court reviewed the undisputed facts regarding what the Amlongs did, and concluded that, under our binding precedent, this conduct was objectively

---

[23]The majority dismisses *Souran* as inapposite because it is a Rule 11 case. After conceding that "many of the same principles apply" to both sanctions statutes, the majority finds significance in the fact that the statutes are "different sources of authority" and in the fact that Rule 11 "is aimed primarily at pleadings" and "addresses the conduct of both parties and attorneys." The majority, however, never gets around to addressing the central reason why *Souran* is, in fact, applicable to this case – because both Rule 11 and Section 1927 impose sanctions on objectively bad conduct, without regard to counsel's state of mind. In their use of the objective standard for sanctions, there is no difference whatsoever between the two statutes.

Nor have I relied upon *dicta* in *Souran*, as the majority suggests. I have cited *Souran* for the proposition that remand is unnecessary where the record contains the facts of counsel's objective conduct, even if it fails to inform us of her state of mind. In *Souran*, the court held quite explicitly that remand to develop the record as to counsel's intentions was unnecessary because the court's inquiry was limited to counsel's conduct – not her state of mind.

73

reckless. I must respectfully dissent from the holding that it must do so again.[24] I believe its job is done.

Our job is to review the district court's conclusion that the Amlongs conduct was objectively reckless. Because the majority does not address this issue at all, I have included the following discussion.

B. ***The district court did not abuse its discretion in concluding that the Amlongs' conduct was objectively reckless.***

In this circuit, an attorney may be sanctioned under Section 1927 when she litigates in objective bad faith. An attorney litigates in objective bad faith when she recklessly pursues a frivolous claim, delaying its dismissal by unreasonably and vexatiously multiplying the proceedings. *Schwartz*, 341 F.3d at 1225.

"Something more than a lack of merit" is required, however, for a claim to be considered frivolous. *Id.* "[I]t is not sufficient that the claim be found meritless; the claim mus be without a plausible legal or factual basis and lacking in justification." *Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 226-27 (7th Cir. 1984) (cited in *Torres v. City of Orlando*, 264 F. Supp. 2d 1046, 1053 (M.D. Fla. 2003) (*aff'd* 88 Fed. Appx. 391 (11th Cir. 2003).

---

[24]But this time after yet another hearing during which Karen Amlong will testify at length to her totally irrelevant good intentions.

74

We have found claims to be frivolous where they were "groundless [and] baseless" and predicated upon "untruthful, outrageous, scandalous, and slanderous" allegations, *Beard v. Annis*, 730 F.2d 741, 745 (11th Cir. 1984), or based upon "false and unsupported allegations." *Footman v. Cheung*, 139 Fed. Appx. 144, 146 (11th Cir. 2005). Other types of frivolous claims are those unsupported by any evidence at all, *In re Mroz,* 65 F.3d 1567, 1573, 1574-75 (11th Cir. 1995), or those having no "reasonable basis in fact." *Barnes*, 158 F.3d at 1214. *See generally Sullivan v. School Bd. of Pinellas County*, 773 F.2d 1182, 1189 (11th Cir. 1985) (district court "must focus on the question whether the case is so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful").

Additionally, counsel's pursuit of the frivolous claim must be more than merely negligent. *Schwartz*, 341 F.3d at 1225. Only a conclusion of "recklessness (by which we . . . mean a gross deviation from conduct that might be reasonable in the circumstances)" will support an award of sanctions under Section 1927. *Id.* at 1227. The district court in *Cordoba* stated it well when it said that"counsel's conduct must have sunk so far beneath a reasonable standard of competence, much deeper than mere negligence, that it became essentially indistinguishable from bad faith." *Cordoba v. Dillard's, Inc* 419 F.3d 1169, 1178 (11th Cir. 2005) (quoting

75

*Cordoba*, 2003 WL 21499011 at *7) (district court opinion).

In this circuit, counsel's pursuit of a frivolous claim is reckless in cases lacking credibility from the outset, such as when an attorney fails to investigate adequately the allegations contained in the complaint.[25] *Collins v. Walden*, 834 F.2d 961, 965 (11th Cir. 1987) (affirming sanctions where counsel had neither direct nor circumstantial evidence of [claim] at time of filing); *Torres*, 264 F. Supp. 2d at 1054-55 (*aff'd* 88 Fed. Appx. 391) (counsel sanctioned where he conducted no independent investigation, relying instead on belief in client); *Barnes*, 158 F.3d at 1214 (reckless to pursue claim that never had any basis in fact). This is especially true when counsel files an amended complaint that contains "baseless allegations," thereby causing defendants to respond to such allegations a second time. *Footman*, 139 Fed. Appx. at 146; *Byrne v. Nezhat*, 261 F.3d 1075, 1116 (11th Cir. 2001).

We have refused to excuse the failure to conduct an independent investigation even though counsel had "little faith in the conclusions of the

---

[25]The federal rules impose a duty upon counsel to certify that they have conducted a reasonable inquiry under the circumstances and have determined that any papers filed with the court are well-grounded in fact, legally tenable, and not interposed for any improper purpose. *See Cooter & Gell,* 496 U.S. at 398 ("Baseless filing puts the machinery of justice in motion, burdening courts and individuals alike with needless expense and delay"). Although the "reasonable inquiry" standard is located in Rule 11, "courts using an objective standard of vexatiousness look to whether an attorney knew or should have known that the claims pursued were frivolous." *Torres*, 264 F. Supp. at 1054 n.19.

[official investigators] and chose, instead, to rely on his "multiple interviews" with his client. *Torres*, 264 F. Supp. 2d at 1054-55 (*aff'd* 88 Fed. Appx. 391). We have made clear that "[a] client's good faith belief in a claim does not automatically make that claim meritorious." *Id.*

In addition to claims lacking credible evidentiary support at filing, "dogged pursuit of a colorable claim becomes actionable bad faith once the attorney learns (or should have learned) that the claim is bound to fail." *In re TCI, Ltd.*, 769 F.2d at 445. When plaintiffs' own witnesses have no knowledge of the facts alleged in the complaint, *Avirgan*, 932 F.2d at 1582, or, worse still, their testimony actually contradicts those allegations, *Beard*, 730 F.2d at 744, counsel is on notice that her claim is without plausible legal or factual basis. "When it becomes apparent that discoverable evidence will not bear out the claim, the litigant and his attorney have a duty to discontinue their quest," risking sanctions if they do not. *Walden*, 834 F.2d at 965. *See also Byrne*, 261 F.3d at 1117 (counsel sanctioned for failure to withdraw frivolous claim). *See generally Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978) (in civil rights cases, sanctions appropriate where claim is frivolous, unreasonable, or groundless, or plaintiff continued to litigate after it clearly became so).

Finally, the reckless pursuit of the frivolous claim must unreasonably and

vexatiously multiply the proceedings. *Schwartz*, 341 F.3d at 1225. We have held that the continued litigation of a claim after it becomes apparent from the discoverable facts that no evidence exists to support it multiplies the proceedings in this way. *Torres*, 264 F. Supp. 2d at 1055 (*aff'd* 88 Fed. Appx. 391). We have also held that counsel multiplies the proceedings vexatiously when his conduct requires the court to spend a considerable amount of time dealing with the consequences of that conduct, including in an evidentiary hearing regarding sanctions. *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1545 (11th Cir. 1993) (defense discovery intransigence required magistrate judge to deal with "countless motions," and "necessitated an evidentiary hearing regarding sanctions, a thirty-eight page order imposing sanctions, and this appeal").

The district court held that the Amlongs' recklessly pursued a frivolous claim, thereby unreasonably and vexatiously multiplying these proceedings. This conclusion is reviewed for an abuse of discretion.[26] The decision to sanction involves both factual and legal issues. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 399 (1990). The district court must determine the factual issue of what the

---

[26]To the extent that the Amlongs imply that the district court applied a mere negligence standard to their conduct, I disagree. The district court clearly held that the Amlongs' conduct was *recklessly* indifferent to the merits of their client's claims, and that the Errata Sheet *vexatiously* multiplied the proceedings.

78

attorney actually did, as well as the legal issue of whether that conduct rises to a sanctionable level. *Id.* Both decisions, however, are reviewed merely for an abuse of discretion. *Id.* at 401.

With respect to the facts, "[a] court of appeals would be justified in concluding that a district court had abused its discretion in making a factual finding only if the finding were clearly erroneous." *Id.* This standard requires us to pay deference to the district court's interpretation of the factual record before it. *Anderson v. City of Bessemer,* 470 U.S. 564, 573-74 (1985). Thus, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Id.*

Reasonableness is the yardstick by which we measure the district court's ultimate legal conclusion that the Amlongs' conduct rose to a sanctionable level. *In re Tutu Wells Contamination Litigation*, 120 F.3d 368, 389 (3d Cir. 1997). In *Tutu Wells*, the Third circuit held that even though sanctioned counsel advanced a plausible explanation for their conduct, there was evidence in the record to support the district court's conclusion that they engaged in a "pattern of delay," as well. In

such circumstances the district court's conclusion was reasonable. *Id.* In view of the "undisputed evidence," the court concluded, "it was not unreasonable for the district court to conclude that the delays in the investigation were willful and in bad faith." *Id.*

Finally, the district court's decision to impose sanctions is entitled to substantial deference because it "is in the best position to review the factual circumstances and render an informed judgment as [it] is intimately involved with the case, the litigants, and the attorneys on a daily basis." *Thomas v. Capital Sec. Services., Inc.*, 836 F.2d 866, 873 (5th Cir. 1988) (en banc). Thus, although we, of course, review the district court's decision, "the issue is not whether we would award sanctions, but whether, applying the appropriate, deferential review standard, we must sustain the district court's decision." *Phonometrics, Inc. v. Westin Hotel. Co.*, 350 F.3d 1242, 1250 n.10 (Fed. Cir. 2003) (affirming sanctions awarded by a district court in the Southern District of Florida and applying Eleventh Circuit law under 28 U.S.C. § 1927).

1.    **The Amlongs recklessly pursued a frivolous claim.**

Karen Amlong testified that because she believed her client, she did not interview any of the people Norelus claimed to have witnessed the incidents of abuse prior to filing the amended complaints. Even after the witnesses'

80

depositions revealed that none supported her version of events at all, counsel admits she did not believe it necessary to order any of the transcripts to evaluate this testimony, nor to conduct any further inquiry. In sum, counsel's belief in her client was premised neither on facts nor on any investigation; she literally had no evidence, other than Norelus's story, prior to filing any of the amended complaints (to which defendants were obliged to respond again) that Jawaid or Hameed committed any of the acts alleged in those complaints.[27] Nor was there ever any such independent evidence.

On the other hand, there was much evidence that Norelus's claims were not credible. The employers' remedial investigation revealed no wrongdoing. The police investigation revealed such "inconsistencies and contradictions" that the State Attorney did not prosecute. There was not one witness, as the Amlongs concede in their brief, who could corroborate her charges of sexual abuse. On the contrary, the witnesses directly contradicted her story, testifying that they never saw any sexual harassment or improper sexual comment, except by Norelus

_____

[27]Amlong testified that she "faxed a form complaint" to Valladares, and at Amlong's direction, an associate of hers provided "technical assistance" and guidance to Valladares for purposes of copying, "cutting and pasting," and preparing what became the original complaint in this action.

herself.[28]  When Norelus herself was deposed, the "inconsistencies" and outright

lies in her own testimony were apparent even to counsel, causing them to have her

polygraphed.  Nonetheless, counsel continued to press this demonstrably

unsupported claim, without engaging in any investigation of Norelus's allegations.

Based upon these undisputed facts, the district court found, as did the

magistrate, that Norelus's claim was frivolous because it "always lacked credible

evidence, or any evidence other than [her] own unreliable recollections" and that

the Amlongs "undertook no reasonable investigation prior to filing any of the

Complaints or at any point during the pendency of this litigation," choosing,

instead, to continue to rely on Norelus's unsubstantiated story.  The district court

concluded that this conduct was reckless.

The Amlongs argue that the district court abused its discretion in concluding

that their conduct was reckless because they relied on their client's  belief in her

"core allegations."  We have previously held, however, that "[i]f an attorney has

failed to conduct a reasonable inquiry into the matter, then the court is obligated to

---

[28]The witness testimony was that she "came to work happy, friendly, she would joke about sex at work and engage in sexually graphic innuendo."  The majority comments that "some witnesses suggested that Jawaid and Norelus might have had a consensual sexual relationship," and that "Amlong said she hoped to exploit these inconsistencies at trial to cast doubt on the witnesses' veracity and draw out unrevealed facts of the story."  I find this comment astonishing.  If Norelus and Jawaid had a consensual sexual relationship, this whole case was a sham and an abuse of the judicial process!

impose sanctions even if the attorney had a good faith belief that the claim was sound." *Mroz,* 65 F.3d at 1573. It will not do to rest upon a "gut feeling" that one's client is a victim. *See Blue*, 914 F.2d at 541. As the Fourth Circuit warned in *Blue*:

> Undoubtedly there are instances in which an attorney acts irresponsibly by failing to investigate the facts behind his client's claim and by instead relying solely on the client's testimony to support his case. "Counsel cannot escape liability, as they attempt to here, by relying solely on their belief that their clients genuinely feel that they were not fairly treated." "No longer is it enough for an attorney to claim that he acted in good faith, or that he personally was unaware of the groundless nature of an argument or claim."

*Id.* at 542 (citations omitted). Thus, the Amlongs' good faith in their belief in their client does not insulate them from the requirements of the federal rules to investigate the claims they bring to the court. "Blind reliance on the client is seldom a sufficient inquiry . . . . " *Southern Leasing Partners, Ltd. v. McMullan*, 801 F.2d 783, 788 (5th Cir. 1986).

Nor did their belief in their client permit the Amlongs to ignore the testimony of all Norelus's own witnesses that indicated that she was lying. In this case, as in *Blue*, "the only 'evidence' ever advanced by plaintiffs on their claims were their own 'unsubstantiated, self-serving, contradictory, and inconsistent claims of discrimination.'" *Id.* at 543 (internal citations omitted). In the face of

such unsubstantiated claims:

> [C]ounsel cannot simply rely on a client's patently incredible testimony when any reasonable investigation of the factual bases for the client's claims or examination of materials obtained in discovery would reveal the paucity and implausibility of the evidence.

*Id.* at 543.[29]

Similarly, in *Byrd v. Hopson*, 108 Fed. Appx. 749 (4th Cir. 2004), the Fourth Circuit affirmed an award of sanctions where:

> [B]ased on a reasonable investigation of the facts and law, [counsel] should have quickly recognized that [the plaintiff's] claims were groundless. The court noted that [the plaintiff's] version of events underlying this lawsuit contained numerous inconsistencies and that the witnesses with whom [counsel] spoke in investigating the case lacked credibility [and] almost all of the information allegedly known by these individuals was hearsay, rumor, or speculation.

*Id.* at 755. In this case, Norelus's witnesses had no knowledge of any improper conduct at all.

---

[29]The Fourth Circuit quoted at length from the district court's opinion on this point:
> Defendant had produced an enormous amount of discovery – much of it clearly unrebutted by any credible evidence in plaintiffs' possession. . . . Counsel, certainly by this time . . . had no reasonable basis upon which to rely on either plaintiff. Significant gaps and inconsistencies existed in plaintiffs' respective versions of events mandating that counsel question their perception of discrimination.. . . Here, access to investigate plantiffs' stories was virtually unchecked. Yet, [plaintiffs']claims were filed, and . . . continued, apparently without any objective thought as to their merit.

914 F.2d at 543.

On the other hand, we have declined to affirm sanctions where counsel, when "hints of problems with the cases" arose, promptly made inquiries so that questioned claims could be further investigated and thus "acted reasonably or close to reasonably in the circumstances." *Schwartz*, 341 F.3d at 1226, 1227 n.6. In contrast, the Amlongs did nothing when "hints of problems" arose in Norelus's case.[30]

Therefore, I conclude that the district court did not abuse its discretion in finding that the Amlongs' belief in their client was unreasonable because it was:

> [P]remised neither on facts nor reasonable investigation. Counsel had literally no evidence beyond Plaintiff's incendiary and contradictory descriptions that Defendants committed any of the acts alleged in the Complaint.

In view of this finding, it was not unreasonable for the district court to conclude that the Amlongs pursuit of Norelus's claim was reckless. Although the Amlongs protest that they prosecuted this case in a straightforward way and in their usual manner, as the district court said in *Torres* "[s]uch conduct would be

---

[30]I would not hold, as the majority seems inclined to do, that having one's client polygraphed is an acceptable substitute for reasonable investigation and evaluation of the discovered facts. First of all, the only thing that the polygraph examination "proves" is that the examinee believes her own story. This, however, is not the measure of a colorable claim. Secondly, the purpose of discovery is to elicit objective facts so that, to the extent possible, the fact finder is relieved of the burden of divining the truth through an electronic swearing match. Similarly, I reject the notion that a psychologist's opinion that the client believes her own story is sufficient to satisfy counsel's duty to investigate.

fine, if the case was worth prosecuting in the first place. It was not." 264 F. Supp.

2d at 1055 (*aff'd* 88 Fed. Appx. 391).

### 2. The filing of the Errata Sheet recklessly multiplied the proceedings.

As with the failure to investigate, the Amlongs do not dispute that they

helped Norelus to prepare and then filed the Errata Sheet, nor that the changes

described here are in that document. At issue is the reasonableness of the district

court's legal conclusion that the filing of the Errata Sheet with those changes

recklessly multiplied these proceedings.

The Amlongs maintain that Rule 30(e) "in no way limits the types and

number of changes" that an errata sheet is permitted to make to a prior

deposition.[31] The majority seems to agree, noting without comment or objection

that Norelus's sworn testimony was changed 868 times by the Errata Sheet.

Although early cases may have given the impression that such changes are

permissible, the rule is, and was at the time the Amlongs filed the Errata Sheet, to

the contrary.

In 1996, when the Amlongs submitted the Norelus Errata Sheet, this rule

---

[31]The Amlongs do concede that errata sheet changes that "materially alter the substance" of the client's testimony are sanctionable when done in actual bad faith. *See Combs v. Rockwell Int'l Corp.*, 927 F.2d 486, 488-89 (9th Cir. 1991) (sanctioning changes that included "reversals of [plaintiff's] answers to key questions").

was already clear.  Four years earlier, in *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992), the court noted that "[a] deposition is not a take home examination."  The court  said:

> The purpose of  Rule 30(e) is obvious.  Should the reporter make a substantive error, i.e.., he reported "yes" but I said "no," or a formal error, i.e., he reported the name to be "Lawrence Smith" but the proper name is "Laurence Smith," then corrections by the deponent would be in order.  The Rule cannot be interpreted to allow one to alter what was said under oath.  If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses.

*Id.*

Similarly, in 1994, the United States District Court for the District of Columbia noted that:

> Defendant . . . argues that Rule 30(e) allows her to make any substantive change she so desires.  While older cases appear to support this position, later cases have often limited this blank check; perhaps because of the potential for abuse.

*SEC v. Parkersburg Wireless Ltd. Liability Co.*,156 F.R.D. 529 (D.D.C. 1994).

The United States District Court for the Middle District of North Carolina, in 1986, sanctioned the plaintiff's attempt to "correct" her deposition "with a 7-page correction list with over 100 corrections in a 260-page deposition, changing 'yes' to 'no' and vice versa."  *Barlow v. Esselte Pendaflex Corp.,* 111 F.R.D. 404, 406 (M.D.N.C. 1986).  The court inferred bad faith from the "manner and number of

87

changes" the errata sheet proposed, characterizing the conduct as "harassing" and causing "unnecessary delay and costs." *Id.*

In *Rios v. Bigler*, 847 F. Supp. 1538, 1546-47 ( D. Kan. 1994), the district court, citing *Greenway*, held that it would consider only those errata sheet changes that clarified the deposition, and not those that materially altered it.

Recent decisions by several courts of appeals, including our own, affirm this interpretation of Rule 30(e). The Tenth Circuit has said, "We do not condone counsel's allowing for material changes to deposition testimony and certainly do not approve of the use of such altered testimony that is controverted by the original testimony." *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n.5 (10th Cir. 2002) ; *accord Burns v. Board of County Com'rs of Jackson County*, 330 F.3d 1275, 1281-82 (10th Cir. 2003) (analogizing to rule that affidavit may not be used to contradict prior sworn testimony). Similarly, the Seventh Circuit has held that "a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'" *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000) (calling such an errata sheet a "foolish tactic").

We too have affirmed a district court's decision to disregard an errata sheet that attempted to make material changes to a deposition on the grounds that the

88

deponent was "confused" at the time of the deposition. *Reynolds v. IBM, Corp.*, 320 F. Supp. 2d 1290, 1301 (M.D. Fla. 2004), *aff'd* 125 Fed. Appx. 982 (11th Cir. 2004) (approving district court's decision to disregard errata changes where deponent did not exhibit any obvious confusion during deposition). Similarly, Norelus's initial sworn answers of "yes" or "no" do not reflect any confusion that should have been "clarified" by the substitution of the exact opposite answer, along with great detail.

The Amlongs contend that the changes made by their Errata Sheet did not materially alter the substance of Norelus's answers. Karen Amlong testified that the changes were really only "immaterial or elaborations," and not "really significant."

The district court's careful review of the changes, attached hereto as Appendix A, led it to find otherwise. For example, Norelus's deposition answer "no" to the question whether she was ever forced to have anal sex, was changed in the Errata Sheet to "yes," as alleged in her complaint. Her deposition testimony regarding an assault by Jawaid was almost completely changed to provide much greater factual detail. Her testimony that she could not remember the color or material of the hairbrush used to sodomize her, was replaced in the Errata Sheet with the color – light to medium brown – and the material – wood. Her deposition

testimony that she did not remember anything that she told the police about the assaults was replaced in the Errata Sheet with a recollection that she told the police that the managers sexually assaulted her. Her deposition testimony that she could not remember anything about the car Hameed put her in or the route they took when he kidnapped her and drove her to his house where she was restrained and repeatedly raped by both Hameed and Jawaid, was replaced in the Errata Sheet with great detail about both the car and the exact route that Hameed took to his house, including many street names and precise directions for the route.

Rather than simply correcting inaccuracies of transcription or mistakes of translation, the district court found that the Errata Sheet changes bolstered Norelus's case by supplying the support for the allegations of her complaint that was glaringly missing in the original deposition. This finding by the district court is not clearly erroneous.

Nor do I find unreasonable the district court's legal conclusion that the filing of this Errata Sheet was reckless. The district court concluded that, "[c]oupled with the complete lack of supporting evidence in this case, the nature and quantity of entries on the Errata Sheet – which bolstered inconsistencies or covered up falsities, and thereafter the Plaintiff's inability to factually support the errata changes at the subsequent deposition – demonstrate bad faith and willful disregard

90

for the judicial process by [the Amlongs]." *See Barlow*, 111 F.R.D. at 406

(inferring bad faith from a similar errata sheet); *Greenway*, 144 F.R.D. at 325.

The Amlongs contend that such a conclusion of bad faith is precluded

because the filing of the Errata Sheet was their good faith effort to "set the record

straight" and because the "corrections" opened Norelus up to potentially

devastating cross-examination. This argument, however, ignores the plain fact that

without the Errata sheet, *Norelus had no case at all.* The district court found that

the Errata Sheet was an effort to "repair the damage" to her deposition by

providing factual support to an otherwise dismissible case. Specifically, the court

found:

> [T]he Court's close examination of the 868 errata changes indicates a concerted effort to provide factual support to an otherwise meritless case. *The information included in the errata changes forms the factual backbone of Plaintiff's case and is unsupported by Plaintiff's deposition, both before and after the preparation of the errata changes* (emphasis added).

There is no clear error in this finding. *See Footman*, 139 Fed. Appx. at 145

(rejecting counsel's characterization as "more truthful and accurate" his

"corrections" to sworn interrogatory answers that bolstered case).

The Amlongs also contend that it was not reasonable for the district court to

conclude that their filing of the Errata Sheet was in objective bad faith because the

91

magistrate ultimately held that, since they believed in their client, they engaged in nothing more than zealous advocacy. But this reliance on the magistrate's legal conclusion is misplaced. As I have pointed out above , in conducting its *de novo* review of the motions for sanctions, the district court is entitled to make whatever use it sees fit of the magistrate's Report and Recommendation. In rejecting an almost identical argument, the Third Circuit in *Tutu Wells* said:

> [The sanctioned law firm] relies on a report by a magistrate judge concluding that the firm's actions during the investigation amounted to nothing more than zealous advocacy in representation of its clients and therefore did not warrant sanctions. The firm submits that the district court had no basis to disagree with the magistrate judge's conclusions. However, the district court in that instance did not owe the magistrate judge any deference. Further, the *undisputed evidence* makes it clear that it was *not unreasonable* for the district court to conclude that the delays in the investigation were willful and in bad faith.

120 F.3d at 389 (emphasis added). Similarly, in this case, while the Amlongs advance an exculpatory explanation for their conduct – zealous advocacy – there was ample evidence in the record to support the district court's finding of recklessness instead, and, therefore, its conclusion was not unreasonable.

Furthermore, the Amlongs' decision to file the Errata Sheet, instead of "discontinu[ing] their quest," *Walden*, 834 F.2d at 965, clearly multiplied the proceedings. We have affirmed sanctions for multiplying the proceedings where

counsel chose to continue to litigate a claim after he should have known that no evidence even remotely suggested that the claim had merit. *Torres*, 264 F. Supp. 2d at 1055 (*aff'd* 88 Fed. Appx. 391).

Based upon these findings, the district court's legal conclusion that the filing of the Errata Sheet was reckless and multiplied these proceedings was not unreasonable.

### 3. The district court's ultimate decision to sanction the Amlongs' conduct was not an abuse of discretion.

In sum, the district court found that, despite their good faith belief in Norelus's story, the Amlongs had a duty to investigate her allegations, which had they fulfilled, would have revealed to them the frivolity of her case. In view of the failure of her own fact witnesses to support her story, and especially after her own falsehood-riddled deposition, in which she too failed to provide evidentiary support for her claim, they were obligated to but did not investigate to determine if there was any evidentiary support at all for her claim.[32] Instead, they prepared and filed an 868 item errata sheet that had the effect of bolstering Norelus's deposition testimony by eliminating inconsistencies and outright lies, and providing support

---

[32]I reject Karen Amlongs' apparent theory that she could rely on Norelus's story because "When I found out we had a female judge, I was just delighted, because I felt that if one woman looks at another woman and simply listens to this woman tell her story, she's going to believe her. . . ."

for what was otherwise a patently frivolous case. Concluding that the Amlongs recklessly pursued a frivolous claim and multiplied these proceedings, the district court held their conduct sanctionable, and exercised its discretion to impose sanctions.[33] I would affirm this decision.

C. ***The district court did not abuse its discretion in awarding costs and fees for the sanctions proceedings.[34]***

Section 1927 requires a "nexus" between the amount claimed as a sanction and the sanctionable conduct itself. *Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir. 1997). The district court awarded fees, costs and expenses from the date of dismissal of Norelus's complaint through the date of the sanctions order. The Amlongs object to the inclusion of fees and costs for the sanctions proceedings themselves.

We review the amount of the sanctions awarded by the district court for an abuse of discretion, and, as we have often said, give great deference to the district court's decision to:

---

[33]Although the majority parses out the district court's decision to award sanctions for the re-opening of Norelus's deposition, I see no reason why these costs and fees are not properly awarded under Section 1927 for the same reasons I have given above.

[34]The majority opinion does not address this issue at all because it does not rule on the merits of sanctions. I include this discussion for the same reasons that I outlined above – that should the district court reimpose sanctions, this issue should be resolved in the interests of judicial economy.

> [I]mpose whatever sanctions appear appropriate to combat the expense, inefficiency and backlog which the judicial process suffers because of wrongfully filed complaints and motions. It is the District Court Judge who sits at this bottleneck and who most accurately perceives the harms which rightful litigants suffer because of [rule] violations. No one is better situated to perceive the measure of the sanction.

*Walden*, 834 F.2d at 966.

The majority of cases hold that fees and costs in connection with the sanctions proceedings themselves may be awarded as the product of the sanctionable conduct. *See Tutu Wells*, 120 F.3d at 388 (citing *Kirk Capital Corp. v. Bailey*, 16 F.3d 1485 1491 (8th Cir. 1994); *Silva v. Witschen*, 19 F.3d 725, 733 n.15 (1st Cir. 1994); *Brandt v. Schal Assocs., Inc.*, 960 F.2d 640, 649-51 (7th Cir. 1992); *In re Stauffer Seeds, Inc.*, 817 F.2d 47, 50 (8th Cir. 1987)). *See also Chambers v. NASCO, Inc.* 501 U.S. 32 (1991) (affirming award of sanctions based in part on the costs associated with the sanctions proceedings themselves, although not directly addressing the issue).[35]

---

[35]Although there is some authority for the proposition that fees and costs for the sanctions proceedings may not be awarded, see *Blue*, 914 F.2d at 548-49, contrary to the Amlongs' assertion, *Blue* is not the "basic law" on this issue. *Blue* has been followed on this issue in only two reported decisions. In fact, even in the Fourth Circuit itself, such awards have been made. *Giganti v. Gen-X Strategies, Inc.*, 222 F.R.D. 299, 316 n.26 (E.D. Va. 2004) (fees incurred in filing, preparing and presenting a sanctions motion are properly included in determining the appropriate sanctions award); *Ballentine v. Taco Bell Corp.*, 135 F.R.D. 117, 126 (E.D.N.C. 1991) (awarding sanctions to compensate defendant for attorneys' fees incurred in preparing and presenting sanctions motion) In an unpublished disposition, even the Fourth Circuit itself has said that "[a] district court may properly include in a Rule 11 sanction attorney's fees and

There is no reason to categorically exclude from a sanction award the attorney's fees and costs arising from the sanctions proceedings themselves, and I agree with the Third Circuit that such an exclusion is unwise. *Tutu Wells*, 120 F.3d at 387.[36]  As that court said:

> The time, effort, and resources expended in bringing sanctionable conduct to light would have been unnecessary had the sanctionable conduct never occurred.  These costs are as much a harm to a party in the litigation as is the delay in the litigation or the substantive prejudice caused by the conduct.  If we exclude from a possible award the costs of sanctions proceedings, we would undermine the compensatory goal of a sanctions award.  Further, if a party is aware *ex ante* that the costs he incurs in exposing sanctionable conduct will never be recouped, that party may decide to forgo a sanctions proceeding altogether.  In so doing, however, that party might allow otherwise sanctionable conduct to go unaddressed.  In such cases, the deterrent goal of a sanction award has been lost; parties who know that the likelihood of facing a sanction proceeding are low may engage in sanctionable conduct more often.

---

expenses that the opponent incurred in establishing the Rule 11 violation." *Wassel v. Samuel*, 46 F.3d 1130, 1995 WL 5772, at *2 (Table) (4th Cir. 1995).  In the context of Rule 11, of course, the 1993 amendments now specifically permit such awards.  Rule 11(c)(1)(A); *Margolis v. Ryan*, 140 F.3d 850, 855 (9th Cir. 1998) (1993 amendments to Rule 11 overrule previous cases disallowing such fees).

Nor is the rule of these cases limited to the imposition of sanctions under Rule 11 as the Amlongs assert.  In *Tutu Wells*, where sanctions were awarded under a variety of theories including Section 1927, the Third Circuit explicitly stated that its analysis of the propriety of that award, which included the costs of the sanctions proceedings themselves, "does not make a distinction between inherent powers sanctions and statute-based or rule-based sanctions.  In respects relevant to our discussion, the sanctioning tools are the same."  120 F.3d at 387 n.21.

[36]As noted above, Congress amended Rule 11 in 1993 to specifically permit the award of fees and costs for the prosecution of the sanctions motions.  Rule 11(c)(1)(A).  Even prior to the amendment, as the Amlongs acknowledge, we too permitted such an award under Rule 11.  *Mike Ousley Productions., Inc. v. WJBF-TV*, 952 F.2d 380, 384 (11th Cir. 1992).

*Id.* at 388. Therefore, I agree with the district court that it has the discretion to award attorney's fees arising from the sanctions proceedings themselves.

In this case, litigation over the sanctions motions has occupied the parties for the past ten years. The time, effort, and resources expended in these proceedings has been "as much a harm to [these defendants] as is the delay in the litigation or the substantive prejudice caused by the conduct." *Id.* I agree with the Tenth Circuit that when "attorneys engage in scorched earth tactics to challenge such a fee award, a refusal to permit recovery of additional fees for defending that award would allow counsel to dilute the value of the original award or force the recipient to abandon that award entirely." *Glass v. Pfeffer*, 849 F.2d 1261, 1266 (10th Cir. 1988). Therefore, I would find no abuse of discretion in the district court's determination that sanctions from the date of the Errata Sheet to the date of sanctions order are appropriate in this case. I believe the award should be affirmed.

IV.

For the foregoing reasons, I believe the district court's judgment awarding sanctions is due to be affirmed in all respects, and, I must respectfully dissent from the majority's conclusion to the contrary. This interminable litigation is now returned to the district court for further proceedings. The district court is told that

97

it must hold yet another hearing to determine the counsel's sincerity in the conduct of this case. The majority, however, fails to instruct the district court what place these facts may have in its ultimate decision whether to reimpose sanctions. I suggest that they have no place at all.

Appendix A

## 2.    The **Errata Sheet**

The Errata Sheet was sixty-three pages long and made 868 changes to Plaintiff's sworn deposition answers, and sought to explain material changes to Plaintiff's testimony through four broad categories: (1) "Did not understand what was being asked"; (2) "Refreshed recollection"; (3) "Poor translation by interpreter"; and (4) "Clarification of response." (See Errata Sheet at 1.) The following are examples of purported material changes in testimony:

| Page | Summary of Plaintiff's Initial Statement in Deposition | Change of Response in Errata Sheet's "Should Say" column |
|---|---|---|
| 28 | Plaintiff did not know anybody by the name of "Lavictore Remy," she just randomly assumed the name. | "Lavictore Remy" was her cousin's name and she testified falsely when first asked about its origin. |
| 35 | Plaintiff declared that she did not lie about making up the social security number listed on her employment application. | The social security number she used was that of her cousin, Lavictore Remy. |

Appendix A

| Page | Summary of Plaintiff's Initial Statement in Deposition | Change of Response in Errata Sheet's "Should Say" column |
|---|---|---|
| 41 | Plaintiff stated she lived with "Tony", Plaintiff's brother Lucarne Norelus, and Lucarne's wife in a shared residence. | She stated that "Tony" did not live at the same residence |
| 58-60 | Plaintiff said she received two applications for employment and described Denny's application process in detail. | Plaintiff received only one application, and described application process differently, including who helped her get the job. |
| 74 | Plaintiff explained that the year she took an English class in Haiti was 1983, and that was the last time she went to school. | She had the English class in *1995* and she understood more English than she earlier admitted. |
| 105 | Plaintiff did not know if she had a niece living in Orlando, Florida. | She did have a niece living in Orlando, Florida. |
| 164 | When asked about Asif's car, Plaintiff could not remember any detail about the make, color, seats or other details. | She described the car in great detail and remembered that it was a light gray, automatic Toyota Camry with fabric seats. |
| 273 & 275 | Plaintiff stated that she did not tell Mr. Fernandez or the police that she got paid for ten hours the day after the first incident. | She told Mr. Fernandez and the police ten hours, but changed her story because she remembered it was 8 or 9 hours. |
| 317 | Plaintiff stated "No, I don't remember" when asked if she was dating "Mike" in January, 1994 and remembered nothing about the relationship. | She was dating "Mike" at this time and they had an intimate relationship. |
| *325* | When asked if Asif ever forced her to have sex "from the back", Plaintiff replied "No," and said that it was always from the front. | Asif did force her to have sex "from the back" and that the sex "was always vaginal, and sometimes anal sex, too". |
| *359 &* 360 | Plaintiff did not remember what kind of car Hameed drove, or any details about it. This was a car in which Plaintiff was supposedly an unwilling passenger when, "six or seven times," she was forced to go to Hameed's home. | She stated that *it* was a cream colored Jaguar with four doors. |
| 364 | When asked at second deposition, "Do you remember the streets that you took between your house and Hameed's house?," Plaintiff answered "no". | She provided detailed directions, including the street-by-street route of this trip. Details included the ordinal directions the car turned on each street. Then, Plaintiff could not explain this changed answer, nor restate directions at all, during her third deposition. |
| 369 | Plaintiff said that Asif removed her skirt during one assault incident: "He pulled it down. I had zipper in the- the skirt had zipper in the back. He unzip it and then he pull it down." | She stated that "He did not take my skirt off me~ he pulled it up." |

## Appendix A

| Page | Summary of Plaintiffs Initial Statement In Deposition | Change of Response in Errata Sheet's "Should Say" column |
|---|---|---|
| 391 | She explained in detail that she informed her brother, Lucarne, about the beatings. | She stated that it was not Lucarne but "Wilson" she told about the beatings. |
| 398 | She described an incident that was supposedly the second time Asif sexually assaulted her, | She changed the entire story of this alleged incident and provided great factual detail not previously stated. For example, she changed the details of what she was doing immediately prior to the incident, and also about what specifically happened during the "attack." |
| 417 | She did not remember the color or material of the brush that Asif allegedly used to sodomize her. | She stated that it was a light to medium colored wooden brush. |
| 503 | Plaintiff said that she never worked the same hours as David Hill. | She stated that "Some of our hours did overlap sometimes". |
| 532 | When asked if David Hill recommended her attorney, Plaintiff answered, "No, I don't remember if it was David." | She changed this answer to "Yes" |
| 914 | Plaintiff stated that she did not remember if she lied about anything in this lawsuit. Then she stated, "No, I did not lie. Because those things, beside the paper of the social security and the income tax, I did not lie." | She stated that "the only things that I lied about were using my cousin's name and social security number on my application at Denny's and on the tax returns". |
| 1136 | Plaintiff did not remember anything that she told the police (this was also repeated earlier in the deposition). | She changed this testimony, stating that she remembered that she told the police that Asif and Hameed sexually assaulted her. |
| | | |

(See generally, Errata Sheet, dated June 14, 1996 (hereinafter "Errata Sheet") (annexed hereto as Appendix A.)